**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **JEFFREY B. KING, SCOTT A. AUSTEN, KEVIN J. HARRIS, AND JOHN J. HAYS,** | ) | |
| **Plaintiffs,** | ) | **Case No. 07-589C** |
| **v.** | ) | **Judge Emily C. Hewitt** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Sandra Mazliah
PASSMAN & KAPLAN, P.C.

Debra D'Agostino
Joanna Friedman
PASSMAN & KAPLAN, P.C.
1090 Vermont Avenue, N.W., Suite 500
Washington, D.C. 20005
TEL: (202) 789-0100
FAX: (202) 789-0101

Attorneys for the Plaintiffs

# TABLE OF CONTENTS


TABLE OF AUTHORITIES........................................iii

I. STATEMENT OF THE CASE........................................ ERROR! BOOKMARK NOT DEFINED.

II. STATEMENT OF RELEVANT FACTS ........................................ ERROR! BOOKMARK NOT DEFINED.

A. GSA CREATED THE FEDERAL PROTECTIVE SERVICE........................ ERROR! BOOKMARK NOT DEFINED.

B. GSA DELEGATED THE AUTHORITY OVER PROTECTION SERVICES TO DOJ.ERROR! BOOKMARK NOT DEFINED.

C. THE FBI POLICE WERE ESTABLISHED, AND GSA CONTINUED TO DELEGATE PROTECTION AUTHORITY TO DOJ. ........................................ ERROR! BOOKMARK NOT DEFINED.

D. SENATOR LEAHY CO-SPONSORED THE FBI REFORM ACT OF 2002, WHICH IS PASSED AND CODIFIED AS 28 U.S.C. §540C........................................ ERROR! BOOKMARK NOT DEFINED.

E. THE HOMELAND SECURITY ACT OF 2002 IS PASSED........................ ERROR! BOOKMARK NOT DEFINED.

E. FBI ISSUES FBI POLICE WEAPONS OFF-DUTY CARRY POLICY; PROTECTIVE SECURITY UNIT. ... ERROR! BOOKMARK NOT DEFINED.

F. THE USMS DECLINED TO RENEW DEPUTATION AUTHORITY TO THE FBI POLICE.ERROR! BOOKMARK NOT DEFINED.

III. ARGUMENT........................................ ERROR! BOOKMARK NOT DEFINED.

A. INTRODUCTION ........................................ ERROR! BOOKMARK NOT DEFINED.

B. PLAINTIFFS' BURDEN OF PROOF TO ESTABLISH SUBJECT MATTER JURISDICTION.ERROR! BOOKMARK NOT DEFINED.

C. 28 U.S.C.A. § 540C IS A MONEY-MANDATING STATUTE. .................... ERROR! BOOKMARK NOT DEFINED.

1. The Language of the Statute Shows it is Money-Mandating.............Error! Bookmark not defined.

2. The Existence of a Condition In Another Section of The Statute, Does Not Preclude a Statue from Being Money-Mandating. ........................................Error! Bookmark not defined.

D. PLAINTIFFS RELY ON THE BACK PAY ACT NOT AS A BASIS FOR JURISDICTION BUT AS A MEANS TO OBTAIN RECOVERY OF THEIR OWED SALARY. ........................................ ERROR! BOOKMARK NOT DEFINED.

E. THE MSPB DOES NOT POSSESS JURISDICTION OVER THIS COMPLAINT.ERROR! BOOKMARK NOT DEFINED.

F. PLAINTIFFS MADE A NON-FRIVOLOUS ASSERTION THAT THEY ARE ENTITLED TO RELIEF.ERROR! BOOKMARK NOT DEFINED.

1. 40 USC §1315 Limits DHS's Authority Over Buildings and Property To the "Extent" Provided By Transfers Made Pursuant To The HSA. ........................................... Error! Bookmark not defined.

2. The Savings Clause (§552(a)) Does Not Apply to the GSA Delegation of Authority to DOJ to appoint special police officers to protect the FBI buildings. .......................... Error! Bookmark not defined.

3. By Authorizing and Allowing the FBI Police to Perform Police DutiesError! Bookmark not defined.

4. By Authorizing and Allowing the FBI Police to Perform Police Duties Without Legal Authority Other Than §540C Since At Least January 2007, the Director Has Established the FBI Police in Accordance with §540C. ................................................................................. Error! Bookmark not defined.

IV. CONCLUSION .......................................................................... ERROR! BOOKMARK NOT DEFINED.

V. REQUEST FOR ORAL ARGUMENT .................................... ERROR! BOOKMARK NOT DEFINED.

# TABLE OF AUTHORITIES

STATUTES

5 U.S.C. § 5545(c)(2) ........ 18

5 U.S.C. § 5596 ........ 20, 21

5 U.S.C. § 5596(b)(1) ........ 2, 21

6 U.S.C. § 101(8) ........ 9

6 U.S.C. § 203 ........ 9, 26, 27, 30

6 U.S.C. § 232 ........ 9, 26, 27

6 U.S.C. § 542 ........ 7

6 U.S.C. § 542(a) ........ 30

6 U.S.C. § 542(b) ........ 30

6 USC § 552(a) ........ 9, 29, 30

6 USC § 552(d) ........ 30

28 U.S.C. § 540C ........ passim

28 U.S.C. §1491 ........ passim

40 USC § 121 ........ 3

40 U.S.C. § 318 ........ passim

40 U.S.C. § 318(a) ........ 3, 25

40 U.S.C. § 318(b) ........ 3

40 U.S.C. § 486(d) ........ 3, 25

40 U.S.C. § 486(e) ........ 3, 25

40 U.S.C. § 1315 ........ passim

Public Law 107-217 ........ 8, 26

Public Law 107-273 ........ 6

Public Law 107-296 ........ 7

RULES

U.S. Court of Federal Claims Rule 12(b)(1) .......... 1, 2, 14, 33

REGULATIONS

5 C.F.R. § 550.803 (2003).......... 20

CASES

*Adair v. United States*, 497 F.3d 1244 (Fed. Cir. 2007).......... 14

*Agee v. United States,* 77 Fed. Cl. 84 (2007) .......... 16, 21

*Agwiak v. United States,* 347 F.3d 1375 (Fed. Cir. 2003).......... 16

*Ancman* v. *United States*, 77 Fed. Cl. 368 (2007).......... 16

*Astor v. United States*, 79 Fed. Cl. 303 (2007).......... 20, 21

*Beuré-Co. v. United States,* 16 Cl. Ct. 42 (1988).......... 13

*Carroll v. United States,* 67 Fed.Cl. 82 (2005) .......... 17, 21

*Dachman v. United States*, 73 Fed. Cl. 508 (2006).......... 22

*Doe v. United States*, 463 F.3d 1314 (Fed. Cir. 2006) .......... 17, 18

*Eastport S.S. Corp. v. United States,* 372 F.2d 1002 (1967).......... 15

*Fisher v. United States,* 402 F.3d 1167 (Fed. Cir. 2005) .......... 13, 23

*Forest Glen Properties, LLC v. United States*, 79 Fed. Cl. 669 (2007) .......... 13

*In re United States*, 463 F.3d 1328 (Fed. Cir. 2006).......... 19, 23

*Good Samaritan Hospital v. Shalala*, 508 U.S. 402 (1993).......... 27

*Greenlee County v. United States,* 487 F.3d 871 (Fed. Cir. 2007).......... 13

*Henke v. United States,* 60 F.3d 795 (Fed. Cir. 1995).......... 14

*Holloway v. United States*, 526 U.S. 1 (1999).......... 27

*Huston v. United States,* 956 F.2d 259 (Fed. Cir. 1992) .......... 16

*James v. Caldera,* 159 F.3d 573 (Fed. Cir. 1998) .......... 16

*Kawa v. United States*, 77 Fed. Cl. 294 (2007).......... 13, 19, 20

*Lamie v. United States Trustee*, 540 U.S. 526 (2004).......... 27

*Land v. Dollar*, 330 U.S. 731 (1947).......... 13

*Martinez v. United States,* 77 Fed. Cl. 318 (2007).......... 16

*McNeil v. United States,* 78 Fed. Cl. 211 (2007) .......... 15

*Montalvo v. United States,* 231 Cl. Ct. 980 (1982) .......... 21

*PODS Inc. v. Porta Stor, Inc.,* 484 F.3d 1359 (Fed. Cir. 2007) .......... 14

*Roberts v. U.S. Dept. of Justice,* 366 F.Supp.2d 13 (D.D.C. 2005) .......... 22, 23

*Russell v. United States*, 78 Fed.Cl. 281 (2007) .......... 13

*Salinas v. United States*, 52 Fed. Cl. 399 (2002) .......... 21

*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) .......... 18, 19

*Sargisson v. United States,* 913 F.2d 918 (Fed. Cir. 1990) .......... 16

*See Johnson v. United States,* ---- Fed. Cl. ----, 2007 WL 4527803, *4 (2007) .......... 14

*Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83 (1998) .......... 14

*United States v. Connolly,* 716 F.2d 882 (Fed. Cir. 1983) .......... 21

*United States v. Fausto,* 484 U.S. 439 (1988) .......... 22

*United States v. Mitchell,* 463 U.S. 206 (1983) .......... 14, 15

*United States v. Scharton,* 285 U.S. 518 (1932) .......... 27

*United States v. Testan,* 424 U.S. 392 (1976) .......... 19

*Walker v. United States,* 11 Cl.Ct. 77 (1986) .......... 21

*Watt v. Alaska,* 451 U.S. 259 (1981) .......... 15

*White Mountain Apache Tribe v. United States,* 249 F.3d 1364 (Fed. Cir. 2001) .......... 13, 14

*Worthington v. United States,* 168 F.3d 24 (Fed. Cir. 1999) .......... 21

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **JEFFREY B. KING, SCOTT A. AUSTEN, KEVIN J. HARRIS, AND JOHN J. HAYS,** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **THE UNITED STATES,** <br><br> **Defendant.** | **Case No. 07-589C** <br> **Judge Emily C. Hewitt** |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Plaintiffs Jeffrey B. King, Scott A. Austin, Kevin J. Harris, and John J. Hays, and all others similarly situated, through counsel, oppose the United States' (Defendant) Motion to Dismiss for lack of subject matter jurisdiction pursuant to pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (R.C.F.C.). Plaintiffs, all whom are employed as Federal Bureau of Investigation (FBI) Police, assert that this Court has jurisdiction over their claim pursuant to the Tucker Act, 28 U.S.C. §1491, because 28 U.S.C. §540C mandates a specific salary Defendants are to pay the FBI Police. Plaintiffs will show that dismissal is inappropriate not only because 28 U.S.C. §540C is money-mandating providing jurisdiction, but also because they have alleged a nonfrivolous claim under the statute.

## I. STATEMENT OF THE CASE

Plaintiffs brought this action on behalf of themselves and all other similarly situated FBI Police for past and future pay and benefits under 28 U.S.C. §540C, which provides that "[t]he rates of basic pay, salary schedule, pay provision, and benefits for members of the FBI police

shall be equivalent to the rates of basic pay, salary schedule, pay provisions, and benefits applicable to members of the United States Secret Service Uniformed Division." Compl. ¶16. Plaintiffs have jurisdiction through the Tucker Act, 28 U.S.C. §1491, because 28 U.S.C. §540C is money-mandating and relief is owed to them pursuant to the Back Pay Act, 5 U.S.C. §5596(b)(1). Compl. ¶ 1.

Defendant filed its Motion to Dismiss (Def.'s Motion) for lack of jurisdiction pursuant to R.C.F.C. 12(b)(1) in lieu of answering the Complaint. The issues before the Court as presented in Defendant's Motion are whether: 1) 28 U.S.C. §540C is an arguably money-mandating statute conferring jurisdiction on the Plaintiffs; 2) this Court has authority to issue relief under the Back Pay Act in this case; and 3) this Court or the Merit Systems Protection Board (MSPB) has proper jurisdiction over this claim. Defendants' Motion to Dismiss, which has nine exhibits, argued that pursuant to the Tucker Act, 28 U.S.C. §1491, this Court lacks subject matter jurisdiction over Plaintiffs' complaint warranting dismissal. Additionally, Defendants argued that Plaintiffs cannot obtain jurisdiction through the Back Pay Act, which as Plaintiffs explain below, was never intended, and that the MSPB, instead of this Court, is the proper authority to evaluate whether back pay is owed to the Plaintiffs under 28 U.S.C.A. §540C.

## II. STATEMENT OF RELEVANT FACTS

### A. GSA Created the Federal Protective Service.

The authority to provide security at federal buildings was originally vested with the General Services Administration (GSA). In 1971, GSA used its authority to create the Federal Protective Service (FPS) pursuant to 40 U.S.C. §318, which stated:

> (a) Appointment: The Administrator of General Services, or officials of the GSA duly authorized by the Administrator, may appoint uniformed guards . . . as special policemen . . . for duty in connection with the policing of all buildings and areas owned or occupied by the US and under the charge and control of the Administrator.

40 U.S.C. §318 (2002). Pursuant to §318(b), these "special police officers" had the authority to conduct criminal investigations, execute search warrants, make arrests, and carry firearms if necessary. *Id.*[1]

**B. GSA Delegated the Authority Over Protection Services to DOJ.**

In addition to having the authority to appoint uniformed guards under §318(a), GSA had the authority, under 40 U.S.C. §§ 486(d) and (e), to delegate to the head of any other Federal agency the right to appoint uniformed guards under §318(a).[2] Accordingly, GSA delegated its authority to appoint uniformed guards to protect certain buildings, including the FBI's J. Edgar Hoover Building (JEH) to the Department of Justice (DOJ).[3] GSA also delegated to DOJ its

[1] Special police officers appointed under this section "shall have the same powers as sheriffs . . . to enforce the laws enacted for the protection of persons and property, and to prevent breaches of the peace, to suppress affrays or unlawful assemblies, and to enforce any rules and regulations promulgated by the Administrator of General Services or such duly authorized officials of the General Services Administration for the property under their jurisdiction . . . ." 40 USC § 318(b).

[2] Section 205(d) of the Federal Property and Administrative Services Act of 1949 (FPASA), authorized GSA's Administrator to delegate "any authority transferred to or vested in him by [FPASA]" to any official in the GSA or the head of any other Federal agency. 40 U.S.C. §486. Section 205(e) of FPASA granted the GSA Administrator similar authority to delegate functions to heads of other Federal agencies. 40 U.S.C. §486(e). These provisions are now codified at 40 U.S.C. §121 (2005).

[3] Defendant did not submit as exhibits the initial delegations of authority from GSA to DOJ. The earliest delegation from GSA to DOJ that the Defendant attached is a Renewal of Delegation, dated 1994. *See* Def.'s Motion at Ex. 1, Appendix I. However, Defendant's Exhibit 3 references a Delegation of Authority Agreement signed between GSA and the Attorney General in 1988-89 and contains the 1989 Delegation from DOJ to the FBI. Additionally, at this point, the record does not contain all the delegations of authority for all the buildings or offices which the FBI Police protect or have protected. Without discovery, Plaintiffs do not have access to these documents.

authority for the Criminal Justice Information Services (CJIS) Division in Clarksburg, West Virginia.[4] DOJ in turn, delegated its authority to the FBI.[5]

**C. The FBI Police Were Established, and GSA Continued to Delegate Protection Authority to DOJ.**

In 1987, pursuant to 40 U.S.C. §318, and the authority delegated from GSA to DOJ, the officers assigned to protect JEH were sworn in as FBI Police Officers under the FBI's Administrative Services Division. *See* Def.'s Motion at 4. As a result, the FBI's Guard, GS-0085, positions were reclassified as the Police Officer, GS-0083, position series. *Id*. The result of these delegations was that GSA relinquished its authority for protection and security at FBI facilities to the FBI, which assigned FBI Police to protect FBI facilities.

In its Motion, Defendant submits that GSA authorized successive delegations of authority to DOJ, and in turn, to the FBI, for protective services at certain FBI facilities. *See* Def.'s Motion at 4. Defendant provided as examples two Delegations of Authority from GSA to DOJ, one issued on December 22, 1998, and another issued on November 28, 2003. *See* Def.'s Motion at Ex. 6 and 7. The 1998 Delegation of Authority renews and amends the delegations for several Justice Buildings, including JEH. *Id*. at Ex. 6. The "Term of Delegation" section states the delegation "extends…until mutually amended or otherwise terminated under paragraph 7 of the agreement. This change eliminates the need for future renewals every 5 years." *Id*. The Delegation also provided that, "to the extent not amended by the 1998 Delegation, the previously granted delegation agreements apply." *Id*.

---

4 The earliest delegation for CJIS the Defendant included as an exhibit is dated 1993. *See* Def.'s Motion at Ex. 2. A memorandum issued a few months later, on July 28, 1993, to the Assistant Director of the FBI clarifies that a "delegation of authority to provide special police and related powers at the Federal Bureau of Investigation (FBI) facility . . . in Clarksburg, West Virginia, has been granted." Def.'s Motion at Ex. 4.

5 *See e.g.,* Def.'s Motion at Ex. 3 and 4.

The 2003 Delegation of Authority includes a cover letter that states the "new" Delegation of Authority documents for JEH and DOJ buildings are included. Def.'s Motion at Ex. 7. Attached to the cover letter is a Delegation of Authority from GSA to DOJ for the DOJ Building and another and for JEH Building. *Id*. The Delegations have different titles, but the content is identical with the exception of the specific building referenced. *Id*. The specific authorities outlined in the 2003 Delegations refer to the general operation and management of the leased building.[6] *Id.* The specific information regarding protection found in the previous Delegations, including the authority to appoint uniformed guards with arrest authority, *see e.g.,* Def.'s Ex. 1 at 8, are not contained in the 2003 Delegations. *See* Def.'s Ex. 7. The 2003 Delegation also does

---

6 ". . . the Agency [DOJ] is responsible for operating and maintaining the property, unless otherwise stated in this Agreement. These responsibilities include:

A. Cleaning
B. Operating and maintaining the Building
C. Ordering and paying for utilities
D. Altering space including abatement work, if necessary . . .
E. Overseeing fire and life safety
F. Providing concessions services through a full concessions delegation
G. Assigning and utilizing space . . . .

GSA retains certain responsibilities in Government-owned space. These responsibilities include:

A. Maintaining high voltage switch gear and fire alarms
B. Periodically assessing customer agency stewardship, overall physical condition of the building, and the Agency's ability to deliver services
C. Replacing equipment and modernizing the Building
D. Preparing and submitting required prospectuses for congressional approval, with the Agency's input
E. Where possible, provide technical assistance and consulting services, which may be subject to reimbursement . . .
F. Acquiring space, including leasing space . . .
G. Conserving artwork."

Def's Motion at Ex. 7.

not contain the language in the 1998 Delegation: "to the extent not amended by the 1998 Delegation, the previously granted delegation agreements apply."

**D. Senator Leahy Co-Sponsored the FBI Reform Act of 2002, Which Is Passed And Codified as 28 U.S.C. §540C.**

In 2002, Senator Patrick Leahy co-sponsored the FBI Reform Act of 2002, the goal of which was to increase FBI Police retention rates by raising their salaries and benefits. Senator Leahy, in his section-by-section analysis of the Act, states that Title V of the FBI Reform Act of 2002, concerning "Enhancement and Formalization of the FBI's Police Force" would provide:

> …statutory authorization for an already existing FBI police force that protects FBI buildings and adjacent streets. Currently, the FBI police suffers from a high rate of turnover due to lower pay and fewer benefits than the Uniformed Division of Secret Service or Capitol and Supreme Court police. This title will disclose that disparity.

Plaintiff's Ex. 1, Sen. Leahy's Section-by-Section Analysis, at 4. On November 2, 2002, the President signed the 21st Century Department of Justice Appropriations Authorization Act. *See* Public Law ("PL") 107-273; H.R. 2215-107th Congress (2001). Title I, §11024, which was later codified as 28 U.S.C. §540C, and is entitled "FBI Police" states:

> This section authorizes the establishment of a police force within the FBI to provide protection for FBI buildings and personnel in areas. For example, FBI police provide security and protection at the main headquarters building in Washington, D.C., the FBI academy at Quantico, Virginia, and the Criminal Justice Information Services Complex in Clarksburg, West Virginia. Additionally, the FBI police will be authorized to provide these security services at the FBI's larger field offices.

*Id.* 28 U.S.C. §540C, as codified, provides in relevant part:

> **(b) Establishment of FBI police; duties.—**
>
> **(1) In general.**--Subject to the supervision of the Attorney General, the Director may establish a permanent police force, to be known as the FBI police.

**(2) Duties.**--The FBI police shall perform such duties as the Director may prescribe in connection with the protection of persons and property within FBI buildings and grounds.

* * *

**(4) Authority.--**

**(A) In general.**--In accordance with regulations prescribed by the Director and approved by the Attorney General, the FBI police may--

**(i)** police the FBI buildings and grounds for the purpose of protecting persons and property;

**(ii)** in the performance of duties necessary for carrying out subparagraph (A), make arrests and otherwise enforce the laws of the United States, including the laws of the District of Columbia;

**(iii)** carry firearms as may be required for the performance of duties;

**(iv)** prevent breaches of the peace and suppress affrays and unlawful assemblies; and

**(v)** hold the same powers as sheriffs and constables when policing FBI buildings and grounds.

* * *

**(5) Pay and benefits.--**

**(A) In general.**--The rates of basic pay, salary schedule, pay provisions, and benefits for members of the FBI police shall be equivalent to the rates of basic pay, salary schedule, pay provisions, and benefits applicable to members of the United States Secret Service Uniformed Division.

**(B) Application.**--Pay and benefits for the FBI police under subparagraph (A)--

**(i)** shall be established by regulation;

**(ii)** shall apply with respect to pay periods beginning after January 1, 2003; and

**(iii)** shall not result in any decrease in the rates of pay or benefits of any individual.

* * *

## E. The Homeland Security Act of 2002 is Passed.

On November 25, 2002, the President signed the Homeland Security Act of 2002 (HSA). On January 24, 2003, the Department of Homeland Security (DHS) Reorganization Plan, which lists the specific steps necessary to organize DHS, went into effect. *See* Plaintiffs' Ex. 2, DHS Reorganization Plan. The Reorganization Plan lists functions, including the FPS, which were to transfer to DHS by March 1, 2003. *See Id.* at 3-4; PL 107-296, Nov. 25, 2002; 6 U.S.C. §542.

The Reorganization Plan does not reference the FBI Police, or the GSA functions relating to protection, nor were either set to transfer to DHS. *See* Plaintiffs' Ex. 2

Several sections of the HSA are relevant to Plaintiffs' case. First, pursuant to §1706 of the HSA, "Transfer of Certain Law Enforcement and Security Functions," 40 U.S.C. §1315 was amended.[7] The amended §1315, which was retitled, "Law Enforcement Authority of Secretary of Homeland Security for Protection of Public Property," provides:

> **(a) In general.--*To the extent provided for by transfers made pursuant to the Homeland Security Act of 2002*,** the Secretary of Homeland Security (in this section referred to as the "Secretary") shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . .
>
> **(b) Officers and agents.--**
> **(1) Designation.**--The Secretary may designate employees of the Department of Homeland Security, including employees . . . of the Federal Protective Service . . . .
> **(2) Powers.**--While engaged in the performance of official duties, an officer or agent designated under this subsection may--
> **(A)** enforce Federal laws and regulations for the protection of
> **(B)** carry firearms;
> **(C)** make arrests without a warrant for any offense against the
> **(D)** serve warrants and subpoenas . . . ;
> **(E)** conduct investigations, on and off the property in question, of
> **(F)** carry out such other activities for the promotion of homeland
>
> *   *   *   *
>
> **(g) Limitation on statutory construction.**--Nothing in this section shall be construed to--
> **(1)** preclude or limit the authority of any Federal law enforcement agency; or
> **(2)** restrict the authority of the Administrator of General Services to promulgate regulations affecting property under the Administrator's custody and control.

40 U.S.C.A. §1315 (emphasis added).

---

[7] Prior to the enactment of the HSA, in August 2002, 40 U.S.C. §318 was recodifed as 40 U.S.C. §1315. After the recodification, the Administrator of General Services still maintained his authority to appoint uniformed guards as special police and also to delegate such authority. *Id.* *See* Pub. Law 107-217 (August 2002). It was only with the passage of the HSA that §1315 was amended to provide the Secretary of DHS with limited authority regarding the protection of federal buildings under GSA's control.

Second, §422 of the HSA, entitled "Functions of Administrator of General Services," provides:

> **(A) Operation, Maintenance, And Protection Of Federal Buildings And Grounds.**—Nothing in this Act may be construed to affect the functions or authorities of the Administrator of General Services with respect to the operation, maintenance, and protection of buildings and grounds owned or occupied by the Federal Government and under the jurisdiction, custody, or control of the Administrator. ***Except for the law enforcement and related security functions transferred under section 403(3), the Administrator shall retain all powers, functions, and authorities vested in the Administrator*** . . . that are necessary for the operation, maintenance, and protection of such buildings and grounds.[8]

6 U.S.C. §232 (U.S.C.A. 2007) (Emphasis added). Section 403(3) of the HSA, referenced above, provides:

> In accordance with title XV (relating to transition provisions), there shall be transferred to the Secretary the functions, personnel, assets, and liabilities of—
>
> * * *
>
> (3) the Federal Protective Service of the General Services Administration, including the functions of the Administrator of General Services relating thereto;

6 U.S.C. §203 (U.S.C.A. 2007). Effective March 1, 2003, FPS was moved from GSA to DHS. Given the statutory language in HSA, some overlap in the protection authorities of GSA and DHS was created. For example, both have responsibilities for protecting GSA-controlled buildings and grounds.

And, third, §1512 (Savings Provision) of the HSA, provides:

> . . . completed administrative actions of an agency shall not be affected by the enactment of this chapter or the transfer of such agency to the Department, but shall continue in effect according to their terms until amended, modified, superseded, terminated, set aside, or revoked in accordance with law by an officer of the United States or a court of competent jurisdiction, or by operation of law.

6 USC §552(a)(1).

---

[8] The term "functions" as used in the HSA includes "authorities, powers, rights, privileges, immunities, programs, projects, activity, duties and responsibilities." 6 U.S.C. §101(8).

**E. FBI Issues FBI Police Weapons Off-Duty Carry Policy; Protective Security Unit.**

On or about November 8, 2004, the FBI issued a memorandum entitled "FBI Police Weapons Off-Duty Carry Policy; Protective Security Unit," which states that:

> Deputy Director Gebhardt previously authorized the Unit Chief, Protective Security Unit (PrSU) to designate FBI Police Officers as emergency reaction personnel, and has granted them the authority to take home their Bureau-issued weapons and supporting equipment to facilitate emergency response in the event of a major incident. This designation provides the FBI Police with an expeditious means of responding to serious or potentially threatening incidents that require an immediate, armed police presence to enhance the defensive posture oat any FBI facility.

*See* Plaintiffs' Ex. 3, November 8, 2004, Memorandum.

**F. The USMS Declined to Renew Deputation Authority to the FBI Police.**

In addition to any statutory authority, certain FBI Police officers obtained authority, or additional authority, by receiving deputization by the U.S. Marshals Service (USMS). *See* Def.'s Motion at 6, fn. 4. For example, the FBI Police at the New York Field Office; the FBI Academy in Quantico, Virginia; and while on travel to certain other locations, were deputized by the U.S. Marshals Service. Officer Yiu Tak Tao, an FBI Police Officer working out of New York City, stated in an affidavit that:

> As far as I can remember since entering on duty with the FBI Police on March 16, 1997, it was necessary for me to receive and maintain special U.S. Marshal Deputation authority. . . .
>
> Prior to the expiration of my authority in 2006, I and the entire unit at the New York Office filed for renewals of our U.S. Marshals Deputation authority. …
>
> * * *

*See* Plaintiffs' Ex. 4, Affidavit of Yiu Tak Tao, dated January 30, 2008.

In correspondence dated January 18, 2007, from Thomas Nunley, Acting Chief, Special Deputations Unit, to Richard McFeely, FBI, Chief Operational Support Section, Mr. Nunley stated that:

> Your request to renew and initiate new special deputation authority for FBI Police Officers in NY, Quantico and Virginia has been reviewed and denied. The basis for denial is that there is existing statutory authority in Title 28 USC Section 540C for FBI Police Officers to perform the functions outlined in your letter. This particular statute negates the need to convey additional authority to these individuals, therefore, deputizing them is not necessary.

*See* Plaintiffs' Ex. 5. Officer Tao states in his affidavit that:

> Since the expiration of my authority in 2006, I have not received U.S. Marshals Deputation authority or any local law enforcement authority of any kind, but have continued to perform all my job functions.

*See* Plaintiffs' Ex. 4. Additionally, Gregg A. Oliverio, an FBI Lead Police Officer and class plaintiff who works out of Clarksburg, WV, has been deployed to other FBI facilities since the passage of §540C, and has not been deputized. *See* Plaintiff's Ex. 6, Affidavit of Gregg A. Oliverio, dated January 28, 2007. Officer Oliverio stated in an affidavit that from January 22-25, 2007, he and three other FBI Police officers were deployed to Dallas, Texas to guard an FBI Mobil Command Post parked in the fenced-in parking lot of the local FBI field office. *Id*. Officer Oliverio stated that to his knowledge, neither he nor the other three officers were deputized by the USMS or local police for this assignment. *Id*. Further, on June 21, 2007, Officer Oliverio and five other officers were deployed to Winchester, VA, for a Family Day event for FBI employees held at a leased FBI office building. *Id.* Officer Oliverio stated that to his knowledge, neither he nor the other three officers were deputized by the USMS or local police for this assignment. *Id*.

Class plaintiff Shawn Strushensky is an FBI Police Officer who works out of the Clarksburg, WV office. *See* Plaintiffs' Ex. 7, Affidavit of Shawn Strushensky, dated January 25, 2008. From December 30, 2007, to January 3, 2008, Officer Strushensky was one of eight police officers sent to Phoenix, Arizona, to work security for an FBI command center in the area.

Officer Strushensky stated that to his knowledge, neither he nor the other eight officers were deputized by the USMS or local police for this assignment. *Id*.

In addition, class plaintiff Scott Giles, who works in Quantico, VA, stated that he served as deployment supervisor for the TOPOFF 4 exercise in Portland, Oregon, from October 12, 2007, to October 20, 2007. *See* Plaintiffs' Ex. 8, Affidavit of Scott Giles, dated January 28, 2008. Just prior to this deployment, on or around September 28, 2007, Officer Giles states that he attended legal training with Attorney Choi from the FBI. *Id*. At this training, Officer Giles asked if deputations were necessary for the officers going on this deployment. *Id*. Officer Giles stated that Attorney Choi replied that deputizations were not necessary as the officers were covered under §540C. *Id*.

Finally, named plaintiff John J. Hays, who works in Clarksburg, WV, was detailed to Portland, OR, from October 12, 2007, to October 20, 2007. *See* Plaintiffs' Ex. 9, Affidavit of John J. Hays, dated January 28, 2008. Officer Hays flew armed from Pittsburgh to Chicago, and then to Portland, where he was armed daily. *Id*. Officer Hays recalled that he and the other officers were informed that they had their "normal jurisdiction" to make arrests in the event of a riot situation. *Id*. During Officer Hays's time in Portland, he was not deputized by the U.S. Marshals Service or by any local agency. *Id*.

## III. ARGUMENT

### A. Introduction

Plaintiffs assert that 28 U.S.C. §540C is an arguably money-mandating statute conferring jurisdiction on the Plaintiffs, who have made a nonfrivolous assertion that they are entitled to relief under that statute. Despite Defendant's contentions, the plain language of the relevant statutes demonstrates that the FBI Police derive their authority from §540C, not 40 U.S.C.

§1315. Further, the evidence shows that §540C is the only authority that the FBI Police could be acting under, and that, because of these facts, the FBI Director has established the FBI Police under §540C. Additionally, this Court has authority to issue relief under the Back Pay Act in this case and is the proper forum (versus the MSPB) to adjudicate this claim.

In *Russell v. United States*, 78 Fed.Cl. 281, 285-286 (2007), the United States Court of Appeals for the Federal Circuit reiterated that this Court is to resolve motions to dismiss due to the lack of a money-mandating source "by a 'single step' at the outset of the case." *Quoting Greenlee County v. United States,* 487 F.3d 871, 876 (Fed.Cir.2007). The Federal Circuit explained that "the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action."[9] *Id.* (*quoting Fisher v. United States,* 402 F.3d 1167, 1172-73 (Fed.Cir.2005) (en banc). Plaintiffs show below that 28 U.S.C.A. §540C is a money-mandating source, leaving the Defendants with no discretion over whether to pay the Plaintiffs, all FBI Police, the amount specified by the statute itself.

[9] However, as the Court explained in *Forest Glen Properties, LLC v. United States*, 79 Fed.Cl. 669 (2007), "[w]hen it appears to a court, however, that the jurisdictional facts are 'inextricably intertwined with the merits,' it may postpone their determination [on jurisdiction] until trial when all relevant evidence may be considered at the same proceeding. *Beuré-Co. v. United States,* 16 Cl.Ct. 42, 52-53 (1988); *see, e.g., Land v. Dollar,* 330 U.S. 731, 735-39 (1947); *Kawa v. United States,* 77 Fed.Cl. 294, 304 n. 4 (2007). Notably, Defendants moved to dismiss only for jurisdiction, not for failure to state a claim. Accordingly, should the Court question the validity of Plaintiffs' claim, Plaintiffs request they be given a fair opportunity to respond in full which necessarily requires a discovery period. Tucker Act jurisdiction requires merely that the statute be "fairly interpreted" or "reasonably amendable" to the interpretation that it "mandates a right of recovery in damages," not that a plaintiff has stated a "proper claim" based on the statute. *White Mountain Apache Tribe v. United States,* 249 F.3d 1364, 1383 (Fed.Cir.2001), *aff'd White Mountain,* 537 U.S. at 468. The two inquiries, *i.e*., jurisdiction and stating a claim, are to be treated as separate. *See Greenlee County, Arizona v. United States,* 487 F.3d 871 (Fed.Cir.2007) (considering the jurisdictional inquiry to be separate from the failure to state a claim inquiry).

**B. Plaintiffs' Burden of Proof to Establish Subject Matter Jurisdiction.**

The question of whether this court has subject matter jurisdiction over a claim is a threshold matter. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94-95 (1998); *PODS Inc. v. Porta Stor, Inc.,* 484 F.3d 1359, 1365 (Fed.Cir.2007). When considering an RCFC 12(b)(1) motion, the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. *See Johnson v. United States,* ---- Fed.Cl. ----, 2007 WL 4527803, *4 (2007); *citing McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189 (1936). The court "consider[s] the facts alleged in the complaint to be true and correct." *Id.; quoting Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988); *see also Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995) (recognizing the court's obligation to "assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor").

Plaintiffs allege they have jurisdiction pursuant to the Tucker Act which confers subject matter jurisdiction upon the Court of Federal Claims for claims against the United States for money damages "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department . . ." and waives the government's sovereign immunity for these claims. 28 U.S.C. §1491; *United States v. Mitchell,* 463 U.S. 206, 212, (1983) (*Mitchell II*). The Tucker Act does not create any substantive right enforceable against the United States for money damages, "but merely confers jurisdiction when such a right is conferred elsewhere." *Adair v. United States*, 497 F.3d 1244, 1250 (Fed.Cir.2007) (citing *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472 (2003). When the source of such alleged right is a statute, such as 28 U.S.C.A. §540C, the statute can only support jurisdiction if it qualifies as "money-mandating." *See White Mountain,* 537 U.S. at 473.

**C. 28 U.S.C.A. § 540C Is a Money-Mandating Statute.**

28 U.S.C.A. §540C(5)(A) states, "The rates of basic pay, salary schedule, pay provisions, and benefits for members of the FBI Police shall be equivalent to the rates of basic pay, salary schedule, pay provisions, and benefits applicable to members of the United States Secret Service Uniformed Division." In *Mitchell II,* 463 U.S. at 217, the Supreme Court held that a statute is money-mandating if it "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." The *Mitchell II* "fair interpretation" rule is satisfied when the statute is "reasonably amenable to the reading" that it is money-mandating. *White Mountain,* 537 U.S. at 473. In *McNeil v. United States,* 78 Fed.Cl. 211, 223-224 (2007), the Court further explained that in order to find that a statute is money-mandating, "the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1007 (1967); *see also id.* at 1009 ("Under Section 1491, what one must always ask is whether the constitutional clause or legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."). 28 U.S.C.A. §540C(5)(A) both uses "shall" which demonstrates that the pay is not discretionary, and specifies a certain sum owed to Plaintiffs (the salary paid to the Secret Service Uniformed Division).

**1. The Language of the Statute Shows it is Money-Mandating.**

Statutory interpretation begins with the language of the statute itself. *See Watt v. Alaska,* 451 U.S. 259, 265 (1981). The language of the statute at issue here, *i.e.*, ". . . rates of basic pay . . . for members of the FBI Police ***shall*** be equivalent . . . ," shows the statute is money-

mandating.[10] (Emphasis added). *See Agwiak v. United States,* 347 F.3d 1375, 1380 (Fed.Cir.2003) ("We have repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating."). *See, e.g., Huston v. United States,* 956 F.2d 259, 261-62 (Fed.Cir.1992); *Grav v. United States,* 886 F.2d 1305, 1307 (Fed.Cir.1989). Additionally, 28 U.S.C.A. § 540C(5)(A) mandates that the pay for FBI Police be equivalent to the pay for the United States Secret Service Uniformed Division, which is a "certain sum" defined by the statute. This Court recently reiterated, in *Agee v. U.S.*, 77 Fed.Cl. 84, 88 (2007), that statutes, like the one at issue here, "that specify a salary to be paid to individuals for their personal services are considered money-mandating provisions and fall within this Court's jurisdiction." *Citing United States v. Fausto,* 484 U.S. 439, 453-54 (1988). *See also Martinez v. United States,* 77 Fed.Cl. 318, 322 (2007) (the Military Pay Act of 1992 ("MPA") which provides in relevant part: "a member of the uniform service who is on active duty ... [is] entitled to the basic pay of the pay grade to which assigned" is money-mandating); *Sargisson v. United States,* 913 F.2d 918, 920 (Fed.Cir.1990) (holding claims for back pay stemming from allegedly unlawful separation from active duty in the military are within the United States Court of Federal Claim's jurisdiction under 28 U.S.C. § 1491); *Ancman* v. *United States*, 77 Fed.Cl. 368, 374-375 (2007) (7 U.S.C. § 204, which governs service members' entitlement to basic pay, is money-mandating); *James v. Caldera,* 159 F.3d 573, 581 (Fed.Cir.1998) (holding "[a] pay statute may serve as the basis for Tucker Act jurisdiction."

---

[10] Moreover, 28 USCA. § 540C(5)(B) explains that pay and benefits provided for the FBI Police under subparagraph (A), "(i) ***shall*** be established by regulation; (ii) ***shall*** apply with respect to pay periods beginning after January 1, 2003; and (iii) ***shall*** not result in any decrease in the rates of pay or benefits of any individual." (Emphasis added).

Additionally, *Carroll v. United States,* 67 Fed.Cl. 82, 86 (2005), while distinguishable, is instructive. In that case, the Court found the Treasury pay statute, §5378(a), was not money-mandating. The provision states, in relevant part, that the:

> . . . Secretary of the Department of the Treasury . . . in his sole discretion shall fix the rates of basic pay for positions within the police forces of the United States Mint and the Bureau of Engraving and Printing without regard to the pay provisions of title 5, United States Code, except that no entry-level police officer shall receive basic pay . . . that is less than the basic rate of pay for General Schedule GS-7 and no executive security official shall receive basic compensation . . . that exceeds the basic rate of pay for General Schedule GS-15.

§ 5378(a). The Court explained that this statute is not money-mandating because it grants the Secretary wide discretion to set pay rates and only limits this discretion by setting a lower (GS-7) and upper (GS-15) bound to the range of salaries the Secretary can implement. In contrast, §540C(5)(A) specifies the exact sum the FBI Police are to be paid, leaving no room for any discretion as to the amount owed as salary.

**2. The Existence of a Condition In Another Section of The Statute, Does Not Preclude a Statue from Being Money-Mandating.**

Defendants in essence concede that 28 U.S.C.A. §540C(5)(A) as written is money-mandating, but instead claim that because another section of the statute, §540C(b)(1), provides that the Director "***may*** establish a permanent police force, to be known as the FBI police," the establishment of the FBI Police is discretionary and a "condition precedent to the purported mandatory pay provision . . . ." Def.'s Motion at 11. (Emphasis added). Thus, the crux of Defendant's argument is that Plaintiffs lack jurisdiction because the Director had discretion to establish the FBI Police or not, and opted not to establish the FBI Police under the statute, a contention that Plaintiffs dispute. This discretionary "condition precedent" argument, however, was already rejected by the United States Court of Appeals for the Federal Circuit in *Doe v. United States*, 463 F.3d 1314, 1324-1325 (Fed.Cir.2006). In that case, the Federal Circuit found

that a statute, 5 U.S.C. §5545(c)(2), using the word "may" is money-mandating. Section 5545(c)(2), which is structured very similarly to the statute at issue in this case, provides:

> The head of an agency, with the approval of the Office of Personnel Management, ***may*** provide that-
> ...
> (2) an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty . . . ***shall*** receive premium pay for this duty on an annual basis . . . .

The Federal Circuit explained this statute was money-mandating because:

> By using the word "may," the statute gives the "head of an agency" the discretion to allow AUO [administratively uncontrollable overtime] pay for employees in particular positions, although this discretion is somewhat limited because the agency may only award AUO pay to employees in positions that meet the requirements listed in section 5545(c)(2). Further, once the agency makes a determination that a particular position is entitled to AUO pay, the employee "shall" receive premium pay under the statute. Thus, the statute is money-mandating because once a condition is met, namely that the head of an agency states that a position meets the criteria listed in subsection (c)(2), the statute requires payment to employees with that position. *See Fisher,* 402 F.3d at 1175; *Samish v. United States,* 419 F.3d 1355, 1364-65 (citing *Perri,* 340 F.3d at 1342-43).[11]

Likewise here, while the statute gives the Director discretion to establish the FBI Police, the statute mandates that once he does, those defined as FBI Police receive pay equivalent to the Uniformed Division of the Secret Service. This is similar to *Doe* where the statute gave the head of an agency discretion to select which positions required overtime pay, but then provided no discretion to choose whether or not the pay the overtime to those in the selected positions. Thus, the presence of a condition itself does not defeat a claim that a statute is money-mandating, although whether the condition is met bears on the merits of a claim.

---

[11] In *Doe*, the Federal Circuit dismissed the plaintiffs' case on the merits because the condition in the statute had never been met, *i.e.,* the head of an agency never stated that plaintiffs' positions met the criteria listed in the statute. *Supra* at 1325.

This "condition precedent" argument was also rejected by the Federal Circuit in *In re United States*, 463 F.3d 1328, 1334 (Fed.Cir.2006), where the Federal Circuit held that a pay statute for bankruptcy judges is clearly a money-mandating statute, for it provides that a bankruptcy judge "shall receive as full compensation for his services, a salary at an annual rate that is equal to 92 percent of the salary of a judge of the district court . . . ." The Federal Circuit explained that while the statute's money-mandating command only benefits an individual who actually holds the position of bankruptcy judge, citing *United States v. Testan,* 424 U.S. 392, 402 (1976) ("The established rule is that one is not entitled to the benefit of a position until he has been duly appointed to it."), the statute is nevertheless to be considered money-mandating. In that case, once the plaintiff's term as a bankruptcy judge ended, he was no longer entitled to the pay mandated by the statute, but the condition precedent (current appointment as a bankruptcy judge) was not determinative of jurisdiction. *In re United States* at 1334.

Additionally, in *Kawa v. United States*, 77 Fed.Cl. 294, 302 (2007), the Court held that where the text of a statute leaves the Government some discretion in making payment on claimed funds, the statute may still be construed as money-mandating if it "(1) ... provide[s] 'clear standards for paying' money to recipients; (2) ... state[s] the 'precise amounts' that must be paid; or (3) as interpreted, compel[s] payment on satisfaction of certain conditions." *Citing Samish Indian Nation,* 419 F.3d at 1364 (*quoting Perri v. United States,* 340 F.3d 1337, 1342-43 (Fed.Cir.2003)). Therefore, even if the Court interprets the inclusion of the word "may" in the statute as implying some discretion, 28 U.S.C. §540C meets the test described in *Kawa*. First, the statute provides clear standards for the payment of money (as " . . . rates of basic pay, salary schedule, pay provisions, and benefits . . . "). Second, the statute states a precise amount of money (". . . equivalent to the rates of basic pay, salary schedule, pay provisions, and benefits

applicable to members of the United States Secret Service Uniformed Division . . ."). And third, the statute compels the payment of money to those defined as FBI Police (". . . rates of basic pay . . . for members of the FBI Police ***shall*** be equivalent . . ."). Even using the Defendant's "condition," §540C meets the third prong of the *Kawa* test. Clearly, the statute compels payment on satisfaction of the condition, i.e. that the FBI Police be established.

## D. Plaintiffs Rely on the Back Pay Act Not as a Basis for Jurisdiction But as a Means to Obtain Recovery of Their Owed Salary.

The Defendant also claimed that even if the Director exercised discretion to establish the FBI Police, Plaintiffs lack jurisdiction because "this Court is not an 'appropriate authority'" to determine whether Plaintiffs satisfied the Back Pay Act. Def.'s Motion at 13. This assertion is contrary to this Court's case law. This Court has jurisdiction where a violation of a money-mandating statute warrants an award of back pay. The Back Pay Act, 5 U.S.C. §5596, states:

> An employee of an agency who . . . is found by appropriate authority under applicable law, rule, regulation . . . to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee-
>
> (A) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect-
>
> (i) an amount equal to all or any part of the pay, allowances, or differentials, as applicable which the employee normally would have earned or received during the period if the personnel action had not occurred, less any amounts earned by the employee through other employment during that period . . . .[12] [13]

[12] The Office of Personnel Management regulations state: "Appropriate authority means an entity having authority in the case at hand to correct or direct the correction of an unjustified or unwarranted personnel action, including (a) a court ...." 5 C.F.R. §550.803 (2003).

[13] "'Unjustified or warranted personnel action' is defined as an act . . . or omission that an appropriate authority subsequently determines, on the basis of substantive or procedural defects, to have been unjustified or unwarranted under applicable law, rule, or regulation. 5 C.F.R. §550.803. Such actions include personnel actions and pay actions, alone or in combination." *Astor v. United States*, 79 Fed.Cl. 303, 318-19 (2007) (holding "Defendant's failure to provide overtime compensation to Plaintiffs . . . constituted an "unwarranted and unjustified personnel action" resulting in the "withdrawal or reduction of all or part of [their] pay.").

§5596(b)(1). In *Agee v. United States,* 77 Fed.Cl. 84, 88 (2007), this Court explained that the Back Pay Act does not itself provide a statutory basis for jurisdiction in the Court of Federal Claims, but it mandates the payment of money "when a plaintiff identifies an 'applicable law, rule, [or] regulation' which has been violated, leading to an reduction in pay." *Citing Carroll v. United States,* 67 Fed.Cl. 82, 85 (2005); *Worthington v. United States,* 168 F.3d 24, 26 (Fed.Cir.1999); 5 U.S.C. § 5596(b)(1).

In other words, to reach the jurisdiction of this Court "[s]ome provision of law other than the Back Pay Act must first mandate, or at least be interpreted to mandate, money damages to an employee suffering an unjustified or unwarranted personnel action..." *Walker v. United States,* 11 Cl.Ct. 77, 80 (1986) *citing Spagnola v. Stockman,* 732 F.2d 908, 912 (Fed.Cir.1984); *United States v. Connolly,* 716 F.2d 882, 887 (Fed.Cir.1983); and *Montalvo v. United States,* 231 Cl.Ct. 980, 982 (1982). Therefore, the Plaintiff must establish the Court's jurisdiction through a law other than the Back Pay Act, and in this case the Plaintiffs have done so by asserting jurisdiction through 28 U.S.C.A. §540C(5)(A), which is a money-mandating provision. *See Salinas v. United States*, 52 Fed.Cl. 399, 401 (2002). This Court has numerous times issued awards pursuant to the Back Pay Act where it determined pay was owed to plaintiffs. *See e.g., Agee, supra* (Plaintiffs awarded money damages under the Back Pay Act, 5 U.S.C. §5596, for compensation wrongfully withheld); *Astor v. United States*, 79 Fed.Cl. 303, 306 (2007) (Plaintiffs are entitled to pre-judgment interest under the Back Pay Act, and reasonable attorneys' fees after the Court found a violation of FLSA).

**E. The MSPB Does Not Possess Jurisdiction over this Complaint.**

Finally, Defendant's claim that the appropriate authority to review this Complaint is the MSPB is also contrary to case law. The Defendant states, "this Court would lack subject matter

jurisdiction as Congress intended to shield the FBI's employment-related decisions from this Courts review." Def.'s Motion at 12-13, *citing Fausto v. United States*, 484 U.S. 439, 454 (1998). However, based on this Court's explanation of the *Fausto* decision in *Dachman v. United States*, 73 Fed.Cl. 508, 516-517 (2006), the Defendant mischaracterized the holding *Fausto* as precluding this Court's jurisdiction. In *Dachman*, the Court held:

> The Supreme Court in *United States v. Fausto* . . . "did not rule that the CSRA [Civil Service Reform Act] provided the only means of judicial review of *any* actions affecting federal employees...." *Bosco v. United States,* 931 F.2d 879, 883 (Fed.Cir.1991) (emphasis in original) . . . .

The United States Court of Appeals for the Federal Circuit has stated:

> The CSRA provides employees with procedural protections with respect to three general types of personnel action: Chapter 23 forbids "prohibited personnel practices," . . . ; Chapter 43 covers removals and reductions in grade . . . ; and Chapter 75 covers "adverse personnel actions". . . . Complaints regarding these types of actions, therefore, are within the purview of the MSPB. Certain other cases . . . may be brought in this court.

*Supra* at 516-7. Indeed, a case where plaintiffs allege they are owed back pay because a money-mandating statute was violated is clearly one of these cases that may be brought in this Court.

Additionally, *Roberts v. U.S. Dept. of Justice,* 366 F.Supp.2d 13, 21 (D.D.C.2005), which was cited by Defendant as support for its argument that this Complaint should have been brought before the MSPB, is inapplicable to this case because it was not brought under the CSRA. In *Roberts*, three employees of the FBI sued seeking injunctive relief under the Administrative Procedure Act (APA) for alleged failure to process whistleblower reprisal complaints in compliance with the CSRA, alleging violations of Privacy Act, retaliation in violation of First Amendment, and violations of the Freedom of Information Act (FOIA). The *Roberts*' court held:

> For most federal employees, section 2302(b)(11) would give the OSC jurisdiction over complaints concerning specified personnel actions taken in violation of the

> rules and/or regulations promulgated under the CSRA. As members of the excepted service, however, FBI employees may not employ the remedial scheme available to most other federal employees. That Congress deliberately excluded FBI employees from the provisions establishing administrative and judicial review for personnel actions involving violations of CSRA implementing regulations suggests that Congress meant to *preclude* judicial review for such actions. . . . Because it is evident that Congress intended to shield the FBI's employment-related decisions from judicial review, including those decisions involving violations of "any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301," FBI employees may not challenge such decisions in federal court under the APA.

Nothing in this holding is applicable to Plaintiffs' claim, which was not brought pursuant to the CSRA or APA. The Plaintiffs do not ask this Court to review any FBI personnel decisions for compliance with any law or regulation, but instead to award pay that is mandated by statute and nondiscretionary.

**F. Plaintiffs Made a Non-Frivolous Assertion That They Are Entitled to Relief.**

To meet their jurisdictional burden, the Plaintiffs need only invoke a money-mandating statute, which they have done, and make "a non-frivolous assertion that they are entitled to relief under the statute." *Fisher v. United States,* 402 F.3d 1167, 1175-76 (Fed.Cir.2005); *see also Doe v. United States,* 463 F.3d 1314, 1323-26 (Fed.Cir.2006); *In re United States,* 463 F.3d 1328, 1335 (Fed.Cir.2006). Section 540C defines the term "FBI Police" as the police force "established to perform such duties as the Director may prescribe in connection with the protection of persons and property within FBI buildings and grounds." Plaintiffs made a non-frivolous assertion that they are entitled to back and future pay under §540C because Defendant authorized and allowed the FBI Police to carry weapons, make arrests, and perform all of their

other job duty functions, without any authority other than §540C, which compels the conclusion that the FBI established the FBI Police in accordance with §540C.[14]

Defendant claims the Plaintiffs are not entitled to relief under the mandatory pay provisions of §540C because the Director of the FBI never "established" the FBI Police Force pursuant to §540C. Defendant submits, as an undisputed fact, that the FBI Police's authority comes from 40 U.S.C. §1315 because, it claims, by recodifying §318 as §1315, Congress "transferred the vested authority of GSA to provide security at federal buildings to DHS." Def.'s Motion at 5. Additionally, Defendant claims that the "savings provision of the [HSA] establishes that the authority GSA had previously delegated to the [DOJ] was not affected by the transfer [of the authority to DHS]." *Id*. Defendant then concludes that by "operation of law and the savings provision of [the HSA] the FBI Police currently derives its authority from 40 USC §1315."[15] *Id.* at 6. Defendant's assertions of fact, and thus of law, fail because the language of the statutes demonstrate that: 1) the HSA did not transfer <u>all</u> the authority to provide security at federal buildings to DHS, but limited DHS's authority to the authority that transferred with FPS (and other specific transfers contained in the HSA), and 2) the HSA's savings clause did not transfer GSA's pre-HSA delegation of authority to the DHS or keep such delegation endlessly effective.

**1. 40 USC §1315 Limits DHS's Authority Over Buildings and Property To the "Extent" Provided By Transfers Made Pursuant To The HSA.**

Originally, under 40 U.S.C. §§318-318d, GSA had general authority to issue and enforce regulations for federal property, including for the protection and policing of that property, and to

---

14 In the alternative, at a minimum, Plaintiffs submit that there are genuine issues of material fact that cannot be decided by this Motion concerning whether the FBI Police have been established pursuant to 28 U.S.C.A. §540C.

15 In other words, Defendant claims that: §1315 transferred GSA's delegation authority to DHS; that the HSA's savings provision kept GSA's delegation to DOJ (and the FBI Police) in tact, and thus the result is that DOJ (and the FBI Police) now derive their protection authority from DHS through §1315.

appoint “special policemen” for “the policing of all buildings and areas owned and occupied by the United States and under the charge and control of the Administrator." 40 U.S.C. §318(a). These “special policemen” were authorized to conduct criminal investigations, execute search warrants, make arrests and carry firearms. In addition, the GSA Administrator had authority to delegate to the head of any other Federal agency the right to appoint special police under §318(a). 40 U.S.C. §§486(d) and (e). Accordingly, GSA delegated it’s authority to protect certain FBI buildings to DOJ, which then delegated the authority to the FBI. Thus, at the time the FBI Police were established in 1987, their statutory authority was derived from 40 U.S.C. §318 through the delegations of authority from GSA to DOJ to the FBI. In addition, FBI Police at the New York Field Office; the FBI Academy in Quantico, Virginia; and while on travel to certain other locations, were deputized by the U.S. Marshals Service.

On November 2, 2002, 28 U.S.C. §540C was codified authorizing the Director of the FBI to establish a permanent police force which would perform such duties as the Director may prescribe in connection with the protection of persons and property within FBI buildings and grounds. *See* 28 U.S.C. §540C(b).

On November 25, 2002, the President signed the HSA, which, among its other provisions, amended 40 U.S.C. §1315 (previously §318), to provide:

> (a) **In General**: *to the extent provided for by transfers made pursuant to the Homeland Security Act of 2002*, the Secretary of Homeland Security … shall protect the buildings, grounds and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property.

40 U.S.C. §1315 (U.S.C.A. 2005) (emphasis added). The language of the revised §1315 is very different from both §318 and the previous §1315, both of which plainly stated that the Administrator of GSA had the authority to appoint uniformed guards as special police to protect “all buildings and areas owned or occupied by the Federal Government and under the change of

the control of the Administrator." Pub. Law 107-217 (Aug. 21, 2002), §1315. Under the amended §1315, the Secretary of DHS was given authority only to the "extent provided by transfers made pursuant to the HSA," not to "all" buildings and areas owned by the federal government and under the charge of the Secretary (or even the Administrator of GSA). *See* 40 U.S.C. §1315 (U.S.C.A. 2005). Accordingly, to determine to what "extent" the HSA transferred the authority of GSA to provide security at federal buildings to DHS, the Court must look at the HSA to determine what "transfers" were made.

First, §422 of the HSA, "Functions of Administrator of General Services," provides that "nothing" in the HSA may be construed to affect GSA's power, functions, and authority with respect to the "operation, maintenance, and ***protection*** of buildings and grounds owned or occupied by the Federal Government" "[***e]xcept for the law enforcement and related security functions transferred under section 403(3) . . . .***" 6 U.S.C. §232 (U.S.C.A. 2007) (Emphasis added). Second, §403(3) of the HSA provides that the "functions, personnel, assets, and liabilities of" the FPS "including the functions of the Administrator of General Services relating thereto" shall be transferred to DHS. 6 U.S.C. §203 (U.S.C.A. 2007).

The plain meaning of the phrase "functions . . . relating thereto" contained in §403(3) refers only to GSA's statutory authorities specifically relating to the FPS, not to all of GSA's statutory authorities relating to protection of federal buildings under GSA's control. Accordingly, the question becomes to what extent GSA's authority transferred along with the transfer of the FPS to DHS. At the time of that transfer, "the functions, personnel, assets, and liabilities" of the FPS *did not* include protecting the FBI's buildings, nor was the protection of the FBI buildings a "function of the Administrator of General Services" relating to the FPS. Instead, the GSA Administrator, as an act separate and apart from the establishment and running

of the FPS, and in no way "relating to" the FPS, delegated GSA's authority under §318 to protect certain buildings to the DOJ, who redelegated it to the FBI. The only connection between GSA's delegation to the DOJ/FBI and the FPS is that because of the delegation the FPS ceased protecting FBI buildings.

Further, the language of the revised §1315 ("to the extent") is telling: Congress could have amended §1315's language by simply substituting DHS for GSA, which would have given DHS all of GSA's authority regarding buildings in GSA's control. However, Congress instead chose to put a specific limitation within the language of the statute, which shows Congress' intent to limit DHS' authority. *See e.g., Lamie v. United States Tr.,* 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text...."); *Holloway v. United States,* 526 U.S. 1, 6 (1999) ("[T]he language of the statutes that Congress enacts provides the most reliable evidence of its intent. For that reason, we typically begin the task of statutory construction by focusing on the words that the drafters have chosen."); *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409 (1993) ("The starting point in interpreting a statute is its language...."); *United States v. Scharton,* 285 U.S. 518, 521 (1932) ("We are required to ascertain the intent of Congress from the language used [in the statute]."). Moreover, §232 clearly states, that except for the functions specifically transferred with FPS, GSA retains all powers and authorities under law that are necessary for the protection of GSA controlled buildings and grounds. 6 U.S.C. §232 (U.S.C.A. 2007). Accordingly, the plain language of §§1315, 232 and 203, when read together, make clear that only the FPS (and its functions) and the GSA Administrator's functions related to FPS, transferred to the DHS under the HSA. There is no language in the HSA or the Reorganization Plan to support the proposition that in transferring FPS's function of protecting certain federal buildings in GSA's control, that

Congress *also* intended to transfer the function of protecting other buildings which FPS had had no responsibility for protecting. See Plaintiff's Ex. 2, Reorganization Plan.

In sum, the amendment to §1315 did two things. First, it transferred certain limited authority to protect federal buildings to the Secretary of DHS and second, although GSA retained authority to protect buildings under its control, the amendment took away from the GSA Administrator the specific statutory authority previously relied upon to appoint "special police," to protect federal buildings under GSA's control. Accordingly, due to the removal of the language, either GSA no longer has the authority to appoint special police (and, therefore, no longer has the authority to delegate such authority to tenant agencies); or GSA still has such power under its general authority to protect its buildings. If GSA no longer has such authority, then by operation of such, the pre-HSA Delegation of Authority to DOJ would cease to be effective. Accordingly, as discussed in more detail, *infra,* the FBI Police could only have been performing their law enforcement duties under §540C, as they had no other authority to do so.

If, on the other hand, GSA still has the authority to delegate protection duties to DOJ, then the issuance of the 2003 Delegation (which specifically removed the language authorizing the FBI Police to act as law enforcement officers), superseded the 1998 Delegation, and therefore, as discussed in more detail, *infra,* the FBI Police could only have been performing their law enforcement duties under §540C, as they had no authority to do so otherwise. The 2003 Delegation only contained language regarding the operation and maintenance of the FBI buildings, but did not contain the specific details regarding protection and authorization of police officers. In addition, contrary to the 1998 Delegation, which specifically stated that to the extent not modified by the 1998 Delegation earlier delegations apply, the 2003 Delegations had no such corresponding language.

Given that that the FBI Police have not been acting under the authority of the DHS, §1315, or under delegated authority from GSA, since at least 2003, either the FBI Police have been acting without any authority or the FBI Police have been acting under the authority of §540C. Section 540C defines the term "FBI Police" as the police force "established to perform such duties as the Director may prescribe in connection with the protection of persons and property within FBI buildings and grounds." In this case, the Director has authorized and ratified the FBI police to perform their duties in connection with the protection of persons and property within FBI buildings and grounds absent GSA delegation, or other authority since at least November 2003. At a minimum, Plaintiff has raised non-frivolous factual and legal issues that make a decision by the court on a motion to dismiss for lack of jurisdiction inappropriate.

**2. The Savings Clause (§552(a)) Does Not Apply to the GSA Delegation of Authority to DOJ to appoint special police officers to protect the FBI buildings.**

The Agency claim in its statement of facts that by "operation of law and the savings provision of [HSA] the FBI Police currently derives its authority from 40 USC §1315." *See* Def.'s Motion at 5-6. As discussed above, §1315 is limited to "the extent" provided for by transfers under HSA. The savings provision of the HSA, 6 U.S.C. §552(a)(1), states:

> [c]ompleted administrative actions of an agency shall not be affected by the enactment of this chapter or the transfer of such agency to the Department, but shall continue in effect according to their terms until amended, modified, superseded, terminated, set aside, or revoked in accordance with law by an officer of the United States or a court of competent jurisdiction, or by operation of law.

For §552(a)(1) to apply to §1315, GSA's delegation of authority to DOJ must be a "completed administrative action." The term "completed administration action," under 6 U.S.C. §552(a)(2,) "includes orders, determinations, rules, regulations, personnel actions, permits, agreements, grants, contracts, certificates, licenses, registrations and privileges." Delegations of authority,

therefore, are not included in the definition of "completed administrative action." In light of the fact that the specific term "delegations of authority" was included in §552(d), this demonstrates that Congress did not mean to include the phrase in §552(a).[16]

However, even if a delegation of authority is a "completed administrative action," under §552(a)(2)'s definition, §552(a)(1) is still inapplicable here because the section specifically provides that only the completed actions of agencies transferred to DHS shall not be affected by the enactment of the HSA or the transfer of that agency to DHS. As discussed *supra,* only the "…the functions, personnel, assets and liabilities of the FPS of the GSA, including the functions of the Administrator of General Services relating thereto" were transferred to DHS, such as GSA's delegation to tenant agencies. 6 U.S.C. §203(3). GSA's administrative actions separate and apart from FPS cannot be included in §552(a)(1).[17] Therefore, §552(a)(1) does not serve to transfer the pre-existing delegations of such function to DHS.[18]

---

[16] §552(d) states "references to an agency that is transferred to the Department" shall be deemed to refer to the Department in not only delegations of authority, but statutes, Executive Orders, etc. *See* 6 USC §552(d). For 6 USC §552(d) to apply to the delegations, FPS would have to be the name on the delegations, not GSA.

[17] However, as discussed, *supra,* even if the Delegations survived, there is a question of fact as to whether the 2003 Delegation superseded or amended the previous delegations to remove the authorization for the FBI Police to act.

[18] The DHS Reorganization Plan (the Plan) referenced in the HSA lists the specific steps that are necessary for the Secretary of DHS to organize the agency. *See* Plaintiffs' Ex. 2, DHS Reorganization Plan, Nov. 25, 2002. The Plan is required to list the agencies that are transferring to DHS, the functions of those agencies or specific divisions that are transferring and the specific dates for when those functions will transfer to DHS. *See* 6 U.S.C. §542(a). Additionally, the Plan is mandated to specify the delegation or assignment of functions transferring to DHS and any other contracts or obligations of agencies transferred. *See* §542(b)(1)(2)(5). The Plan provides that effective March 1, 2003, the functions of several agencies and specific divisions within the agency, including, but not limited to, the FPS, transfer to DHS. *See* the Plan, p. 4. It does not reference that the functions of the GSA, or any relating delegations of authority, or the FBI Police. This is significant because the Plan states it must identify any functions of the agencies not transferred under the Plan, and must specify the delegation or assignment of functions transferred to the Department under the Plan. *See* §542(b). Consequently, the DHS Reorganization Plan did not transfer the functions of the GSA that are unrelated to the FPS.

### 3. By Authorizing and Allowing the FBI Police to Perform Police Duties Without Legal Authority Other Than §540C Since At Least November 2004, the Director Has Established the FBI Police in Accordance with §540C

Although Plaintiffs have stated a non-frivolous claim that the FBI established the FBI Police Force pursuant to authority in §540C, *supra,* sufficient to defeat the Defendant's Motion to Dismiss for Lack of Jurisdiction, Plaintiffs submit an alternative argument that they are entitled to relief under the statute, for at least the period November 2004 to present.[19] On or about November 8, 2004, a memorandum entitled "FBI Police Weapons Off-Duty Carry Policy; Protective Security Unit," was issued stating that:

> Deputy Director Gebhardt previously authorized the Unit Chief, Protective Security Unit (PrSU) to designate FBI Police Officers as emergency reaction personnel, and has granted them the authority to take home their Bureau-issued weapons and supporting equipment to facilitate emergency response in the even of a major incident. This designation provides the FBI Police with an expeditious means of responding to serious or potentially threatening incidents that require an immediate, armed police presence to enhance the defensive posture oat any FBI facility.

Plaintiffs' Ex 3. While §540C states that FBI Police may "carry firearms as may be required for the performance of their duties," §1315 only authorizes FBI Police to "carry firearms" "while engaged in the performance of official duties." *See* 28 U.S.C. §540C(b)(4)(iii); 40 U.S.C. §1315. Clearly, §540C gives the FBI more latitude to determine when an officer can carry a firearm because it is "required" for the performance of her duty, while §1315 only allows the officer to carry the firearm while actually "engaged in" the performance of her duties. The FBI policy,

---

[19] Plaintiffs require discovery to determine whether, and how much earlier, the FBI established the police force. The different authorities under which the FBI claims the officers have worked (e.g. §318, §1315, the USMS Deputization, etc.) each specify different powers and authority for the officers. The Plaintiffs need to discover what powers and duties, in each locations, the FBI has authorized its officers to act. If the FBI Officers have been acting under authority only allowed by §540, then a claim can be made that the FBI established the police when such authority was authorized.

therefore, tracks §540C, not §1315. Clearly, the authority the FBI Police actually utilize exceeds that allowed by §1315, as the FBI Police carry their weapons while not engaged in the performance of their duties. Thus, this Policy appears to fall squarely under §540C which allows the FBI to determine that taking the firearm home is "required" for the better and more efficient performance of the officer's duty. Therefore, the Court can infer that because the FBI Police are acting pursuant to §540C, the FBI Police have been established under §540C.

**4. By Authorizing and Allowing the FBI Police to Perform Police Duties Without Legal Authority Other Than §540C Since At Least January 2007, the Director Has Established the FBI Police in Accordance with §540C.**

Additionally, for at least the period January 2007 to present, the USMS has ceased deputation of the FBI Police, leaving only §540C as the possible source of the FBI Police's authority. The Defendant states in its Motion that FBI Police Officers in the FBI New York Field Office and at the FBI Academy in Quantico, VA do not operate under authority delegated to the FBI originally from GSA, but are "deputized by the US Marshals Service." *See* Def.'s Motion at 6, fn. 4.[20] In addition, Defendant asserts that there is "no authority for the FBI Police to protect other FBI facilities absent deputation by the USMS." *Id.* Therefore, according to the FBI's argument, one of two things must be true: either FBI Police officers in Quantico, New York, and other FBI facilities perform their job functions in accordance with authority vested to them by the USMS or they had no authority whatsoever to act.

While the USMS previously deputized FBI Police Officers, the USMS ceased doing so in January 2007, on grounds that "there is existing statutory authority in Title 28 USC Section 540C for FBI Police Officers to perform the functions." *See* Plaintiffs' Ex. 5. Despite their lack of

[20] The FBI points out that none of the named plaintiffs work out of New York City and/or Quantico. This is true, although many of the officers in those locations have joined the class by executing an election form and designation of representative form.

deputation, the FBI Police Officers in Quantico and New York have continued to perform their law enforcement duties. *See* Plaintiffs' Ex. 4, 6, 7, 8, and 9. In addition, officers have traveled to other facilities around the country to perform law enforcement duties. See Plaintiffs' Ex. 6, 7, and 9. Section 540C defines the term "FBI Police" as the police force "established to perform such duties as the Director may prescribe in connection with the protection of persons and property within FBI buildings and grounds." Therefore, by allowing the FBI Police to perform their duties in connection with the protection of persons and property within FBI buildings and grounds absent USMS deputization, the Director authorized and ratified the FBI Police. In doing so, the Director has established the FBI Police Force in accordance with §540C, albeit without ministerial acts. Moreover, since §540C does not provide for the "partial" establishment of an FBI Police force, *i.e.*, for only limited locations, buildings, or purposes, Plaintiffs contend that the Director established the FBI Police Force for *all* FBI Police in all locations. To find otherwise would mean that these officers have been acting without any authority for at least one year, if not more, thus invalidating all actions (including, but not limited to, arrests and citations) effectuated by these officers during this period.

## IV. CONCLUSION

For all the reasons discussed above, Plaintiffs respectfully request the Court DENY Defendant's Motion to Dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the R.C.F.C. This Court has jurisdiction over their claim pursuant to the Tucker Act, 28 U.S.C. §1491, because 28 U.S.C. §540C mandates a specific salary Defendants are to pay the FBI Police.

## V. REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully requests the Court schedule oral arguments in this matter prior to issuing a decision on the Defendant's Motion to Dismiss and the Plaintiffs Opposition thereto.

February 1, 2008

Respectfully submitted,

Sandra Mazliah
PASSMAN & KAPLAN, P.C.

Debra D'Agostino
Joanna Friedman
PASSMAN & KAPLAN, P.C.
1090 Vermont Avenue, N.W., Suite 500
Washington, D.C. 20005
TEL: (202) 789-0100
FAX: (202) 789-0101

Attorney for the Plaintiffs

# Plaintiffs' Exhibit No. 1

# U.S. SENATOR PATRICK LEAHY

**CONTACT: Office of Senator Leahy, 202-224-4242** **VERMONT**

## FBI REFORM ACT of 2002
Chief Sponsors: Sen. Patrick Leahy, Sen. Charles Grassley
**SECTION-BY-SECTION ANALYSIS**

**TITLE I. Improving FBI Oversight.** Title I of this bill provides for improved Department of Justice and Congressional oversight of the FBI by ensuring that the Department of Justice Office of the Inspector General ("OIG") is authorized to investigate allegations of misconduct at the FBI and requiring a report to the Judiciary Committees on how the OIG carries out this new authority. This title is consistent with provisions in the DOJ Authorization Act, S. 1319/H.R. 2215, which have passed the Senate by unanimous consent.

### Section 101. Authority of Department of Justice Inspector General

This section would amend Section 8E of the Inspector General Act of 1978 (5 U.S.C. App.) to provide explicit statutory authority for the OIG to investigate all allegations of criminal or administrative misconduct by DOJ employees, including FBI personnel. The OIG is also authorized to refer certain matters to the FBI Office of Professional Responsibility or to the internal affairs office of the appropriate component of the Department. The Attorney General is directed to promulgate regulations implementing this OIG authority.

For many years, the FBI was excluded from OIG jurisdiction and the FBI's own internal Office of Professional Responsibility had sole authority to investigate FBI personnel misconduct, unless the Attorney General made an exception. The FBI's exclusive domain to investigate its own misconduct was unique in the Department and created the appearance of a conflict of interest. On July 11, 2001, Attorney General Ashcroft issued a new rule expanding the OIG's jurisdiction over the FBI.. This section is consistent with, and codifies, the Attorney General's new rule.

### Section 102. Review of the Department of Justice

To ensure that the OIG has the necessary structure and resources to effectively assume its new jurisdiction over the FBI and that the Congress is fully informed of such needs, this subsection requires the Inspector General to: (1) appoint an official to help supervise and coordinate oversight operations and programs of the FBI

ensure quality assurance and control in accordance with guidance from the DoD Polygraph Institute and the DCI. No adverse personnel action could be taken solely by reason of physiological reaction on an exam without further investigation and personal decision by the Director. Employees could have prompt access to unclassified reports of their exams that relate to adverse personnel action. Section 404 requires a report within 9 months of the enactment of the Act on any further legislative action appropriate in the personnel security area.

**TITLE V. Enhancement and Formalization of the FBI's Police Force.** This title provides statutory authorization for an already existing FBI police force that protects FBI buildings and adjacent streets. Currently, the FBI police suffers from a high rate of turnover due to lower pay and fewer benefits than the Uniformed Division of Secret Service or Capitol and Supreme Court police. This title would close this disparity.

**Sections 501-503. Definitions; Establishment; Authority of Metropolitan Police**

Section 501 defines the terms "Director," "FBI buildings and grounds," and "FBI police" as used in the title. Section 502 authorizes the FBI Director to establish the FBI police, subject to the Attorney General's supervision, to protect persons and property within FBI buildings and grounds, including adjacent streets and sidewalks within 500 feet. FBI buildings and grounds would include any building occupied by the FBI and subject to FBI supervision and control, the land on which such building is situated, and enclosed passageways connecting such buildings. FBI police would be uniformed representatives of the FBI with authority to make arrests and otherwise enforce federal and D.C. laws, carry firearms, prevent breaches of the peace, suppress unlawful affrays and unlawful assemblies, and hold the same powers as sheriffs and constables. FBI police would not have authority to serve civil process. Pay and benefits would be equivalent to pay and benefits for the Secret Service Uniformed Division. Section 503 provides that the authority of the Washington, D.C. Metropolitan Police would not be affected by this title.

**Title VI. Reports.** This title requires two separate reports by the Attorney General and one by the General Accounting Office.

**Section 601. FBI Authority and Mission**

Section 601 requires the Attorney General to submit a report to Congress on the legal authority for FBI programs and activities, identifying those that have express statutory authority and those that do not. The FBI does not have a statutory charter. One was proposed in 1979 but never enacted. Many FBI functions including its national intelligence and counterintelligence activities are authorized by Executive order rather than by statute. This section also requires the Attorney General to recommend the criminal statutes for which the FBI should have investigative

# Plaintiffs' Exhibit No. 2

DEPARTMENT OF HOMELAND SECURITY
REORGANIZATION PLAN
November 25, 2002

***Introduction***

This Reorganization Plan is submitted pursuant to Section 1502 of the Department of Homeland Security Act of 2002 ("the Act"), which requires submission, not later than 60 days after enactment, of a reorganization plan regarding two categories of information concerning plans for the Department of Homeland Security ("the Department" or "DHS"):

(1) The transfer of agencies, personnel, assets, and obligations to the Department pursuant to this Act.

(2) Any consolidation, reorganization, or streamlining of agencies transferred to the Department pursuant to this Act. Section 1502(a).

Section 1502(b) of the Act identifies six elements, together with other elements "as the President deems appropriate," as among those for discussion in the plan. Each of the elements set out in the statute is identified *verbatim* below, followed by a discussion of current plans with respect to that element.

This plan is subject to modification pursuant to Section 1502(d) of the Act, which provides that on the basis of consultations with appropriate congressional committees the President may modify or revise any part of the plan until that part of the plan becomes effective. Additional details concerning the process for establishing the Department will become available in the coming weeks and months, and the President will work closely with Congress to modify this plan consistent with the Act.

***Plan Elements***

**(1) Identification of any functions of agencies transferred to the Department pursuant to this Act that will not be transferred to the Department under the plan.**

Except as otherwise directed in the Act, all functions of agencies that are to be transferred to the Department pursuant to the Act will be transferred to the Department under the plan. The functions of agencies being transferred to the Department which the Act directs are not to be transferred are the following:

- Pursuant to Section 201(g)(1) of the Act, the Computer Investigations and Operations Section ("CIOS") of the National Infrastructure Protection Center ("NIPC") of the Federal Bureau of Investigation ("FBI") will not transfer to the Department with the

rest of NIPC. CIOS is the FBI headquarters entity responsible for managing all FBI computer intrusion field office cases (whether law enforcement or national security related).

- Pursuant to Sections 421(c) & (d) of the Act, the regulatory responsibilities and quarantine activities relating to agricultural import and entry inspection activities of the United States Department of Agriculture ("the USDA") Animal and Plant Health Inspection Service ("APHIS") will remain with the USDA, as will the Secretary of Agriculture's authority to issue regulations, policies, and procedures regarding the functions transferred pursuant to Sections 421(a) & (b) of the Act.

- Pursuant to Subtitle B of Title IV of the Act, the authorities of the Secretary of the Treasury related to Customs revenue functions, as defined in the statute, will not transfer to the Department.

- Functions under the immigration laws of the United States with respect to the care of unaccompanied alien children will not transfer from the Department of Justice to DHS, but will instead transfer to the Department of Health and Human Services pursuant to Section 462 of the Act.

**(2) Specification of the steps to be taken by the Secretary to organize the Department, including the delegation or assignment of functions transferred to the Department among officers of the Department in order to permit the Department to carry out the functions transferred under the plan.**

A. Steps to be taken by the Secretary to organize the Department. The President intends that the Secretary will carry out the following actions on the dates specified. All of the following transfers shall be deemed to be made to DHS, and all offices and positions to be established and all officers and officials to be appointed or named shall be deemed to be established, appointed, or named within DHS.

January 24, 2003 (effective date of the Act pursuant to Section 4):

- Establish the Office of the Secretary.

- Begin to appoint, upon confirmation by the Senate, or transfer pursuant to the transfer provisions of the Act, as many of the following officers as may be possible:
  (1) Deputy Secretary of Homeland Security
  (2) Under Secretary for Information Analysis and Infrastructure Protection
  (3) Under Secretary for Science and Technology
  (4) Under Secretary for Border and Transportation Security

(5) Under Secretary for Emergency Preparedness and Response
(6) Director of the Bureau of Citizenship and Immigration Services
(7) Under Secretary for Management
(8) Not more than 12 Assistant Secretaries
(9) General Counsel
(10) Inspector General
(11) Commissioner of Customs

- Name, as soon as may be possible, officers to fill the following offices created by the Act:
  (1) Assistant Secretary for Information Analysis
  (2) Assistant Secretary for Infrastructure Protection
  (3) Privacy Officer
  (4) Director of the Secret Service
  (5) Chief Information Officer
  (6) Chief Human Capital Officer
  (7) Chief Financial Officer
  (8) Officer for Civil Rights and Civil Liberties
  (9) Director of Shared Services
  (10) Citizenship and Immigration Ombudsman
  (11) Director of the Homeland Security Advanced Research Projects Agency

- Establish, within the Office of the Secretary, the Office for State and Local Government Coordination, the Office of International Affairs, and the Office of National Capital Region Coordination.

- Establish the Homeland Security Advanced Research Projects Agency and the Acceleration Fund for Research and Development of Homeland Security Technologies.

- Establish within the Directorate of Science and Technology the Office for National Laboratories.

- Establish the Bureau of Border Security, the Bureau of Citizenship and Immigration Services, and the Director of Shared Services.

- Establish the Transportation Security Oversight Board with the Secretary of Homeland Security as its Chair.

March 1, 2003:

- Transfer the Critical Infrastructure Assurance Office ("CIAO") of the Department of Commerce, the National Communications System ("the NCS"), the NIPC of the FBI (other than the CIOS), the National Infrastructure Simulation and Analysis Center ("NISAC"), the Energy

Assurance Office ("EAO") of the Department of Energy, and the Federal Computer Incident Response Center of the General Services Administration ("FedCIRC").

- Transfer the Coast Guard.

- Transfer the Customs Service, the Transportation Security Administration ("the TSA"), functions of the Immigration and Naturalization Service ("the INS"), the Federal Protective Service ("the FPS"), the Office of Domestic Preparedness ("the ODP"), and the Federal Law Enforcement Training Center ("the FLETC").

- Transfer the functions of the Secretary of Agriculture relating to agricultural import and entry inspection activities under the laws specified in Section 421(b) of the Act from the Animal and Plant Health Inspection Service.

- Transfer the United States Secret Service.

- Transfer the following programs and activities to the Directorate of Science and Technology:

  - The chemical and biological national security and supporting programs and activities of the nonproliferation and verification research and development program of the Department of Energy.

  - The life sciences activities related to microbial pathogens of the Biological and Environmental Research Program of the Department of Energy.

  - The National Bio-Weapons Defense Analysis Center of the Department of Defense.

  - The nuclear smuggling programs and activities within the proliferation detection program of the nonproliferation and verification research and development program of the Department of Energy.

  - The nuclear assessment program and activities of the assessment, detection, and cooperation program of the international materials protection and cooperation program of the Department of Energy and the advanced scientific computing research program and activities at Lawrence Livermore National Laboratory of the Department of Energy.

  - The Environmental Measurements Laboratory of the Department of Energy.

- Transfer the Federal Emergency Management Agency ("FEMA").

- Transfer the Integrated Hazard Information System of the National Oceanic and Atmospheric Administration, which shall be renamed "FIRESTAT."

- Transfer the National Domestic Preparedness Office of the FBI, including the functions of the Attorney General relating thereto.

- Transfer the Domestic Emergency Support Team of the Department of Justice, including the functions of the Attorney General relating thereto.

- Transfer the Metropolitan Medical Response System of the Department of Health and Human Services, including the functions of the Secretary of Health and Human Services and Assistant Secretary for Public Health Emergency Preparedness relating thereto.

- Transfer the National Disaster Medical System of the Department of Health and Human Services, including the functions of the Secretary of Health and Human Services and Assistant Secretary for Public Health Emergency Preparedness relating thereto.

- Transfer the Office of Emergency Preparedness and the Strategic National Stockpile of the Department of Health and Human Services, including the functions of the Secretary of Health and Human Services and Assistant Secretary for Public Health Emergency Preparedness relating thereto.

- Transfer to the Secretary the authority (in connection with an actual or threatened terrorist attack, major disaster, or other emergency in the United States) to direct the Nuclear Incident Response Team of the Department of Energy to operate as an organizational unit.

June 1, 2003:

- Transfer the Plum Island Animal Disease Center of USDA.

- Establish the Homeland Security Science and Technology Advisory Committee.

By September 30, 2003:

- Complete any incidental transfers, pursuant to Section 1516 of the Act, of personnel, assets, and liabilities held, used, arising from, available, or to be made available, in connection with the functions transferred by the Act.

B. Delegation or Assignment Among Officers of Functions Transferred to the Department. The President intends that the Secretary will delegate or assign transferred functions within the Department as follows:

**1. Information Analysis and Infrastructure Protection**

a. Under Secretary for Information Analysis and Infrastructure Protection ("IA and IP"): Will be responsible for oversight of functions of NIPC, NCS, CIAO, NISAC, EAO, and FedCIRC transferred by the Act, the management of the Directorate's Information Analysis and Infrastructure Protection duties, and the administration of the Homeland Security Advisory System.

b. Assistant Secretary for Information Analysis: Will oversee the following Information Analysis functions:

- Identify and assess the nature and scope of terrorist threats to the homeland; detect and identify threats of terrorism against the United States; and, understand such threats in light of actual and potential vulnerabilities of the homeland.

- In coordination with the Assistant Secretary for Infrastructure Protection, integrate relevant information, analyses, and vulnerability assessments (whether such information, analyses, or assessments are provided or produced by the Department or others) in order to identify priorities for protective and support measures by the Department, other agencies of the Federal Government, State and local government agencies and authorities, the private sector, and other entities.

- Ensure the timely and efficient access by the Department to all information necessary to discharge the responsibilities under Section 201 of the Act, including obtaining such information from other agencies of the Federal Government.

- Review, analyze, and make recommendations for improvements in the policies and procedures governing the sharing of law enforcement information, intelligence information, intelligence-related information, and other information relating to homeland security within the Federal

Government and between the Federal Government and State and local government agencies and authorities.

- Disseminate, as appropriate, information analyzed by the Department within the Department, to other agencies of the Federal Government with responsibilities relating to homeland security, and to agencies of State and local governments and private sector entities with such responsibilities in order to assist in the deterrence, prevention, preemption of, or response to, terrorist attacks against the United States.

- Consult with the Director of Central Intelligence and other appropriate intelligence, law enforcement, or other elements of the Federal Government to establish collection priorities and strategies for information, including law enforcement-related information, relating to threats of terrorism against the United States through such means as the representation of the Department in discussions regarding requirements and priorities in the collection of such information.

- Consult with State and local governments and private sector entities to ensure appropriate exchanges of information, including law enforcement-related information, relating to threats of terrorism against the United States.

- Ensure that—

    1. Any material received pursuant to the Act is protected from unauthorized disclosure and handled and used only for the performance of official duties; and

    2. Any intelligence information under the Act is shared, retained, and disseminated consistent with the authority of the Director of Central Intelligence to protect intelligence sources and methods under the National Security Act of 1947 (50 U.S.C. Section 401, et seq.) and related procedures and, as appropriate, similar authorities of the Attorney General concerning sensitive law enforcement information.

- Request additional information from other agencies of the Federal Government, State and local government agencies, and the private sector relating to threats of terrorism in the United States, or relating to other areas of responsibility assigned by the Secretary, including the entry into cooperative agreements through the Secretary to obtain such information.

- Establish and utilize, in conjunction with the Chief Information Officer of the Department, a secure communications and information technology infrastructure, including data-mining and other advanced analytical tools, in order to access, receive, and analyze data and information in furtherance of statutory responsibilities, and to disseminate information acquired and analyzed by the Department, as appropriate.

- Ensure, in conjunction with the Chief Information Officer of the Department, that any information databases and analytical tools developed or utilized by the Department—

    1. Are compatible with one another and with relevant information databases of other agencies of the Federal Government; and

    2. Treat information in such databases in a manner that complies with applicable Federal law on privacy.

- Coordinate training and other support to the elements and personnel of the Department, other agencies of the Federal Government, and State and local governments that provide information to the Department, or are consumers of information provided by the Department, in order to facilitate the identification and sharing of information revealed in their ordinary duties and the optimal utilization of information received from the Department.

- Coordinate with elements of the intelligence community and with Federal, State, and local law enforcement agencies, and the private sector, as appropriate.

- Provide intelligence and information analysis and support to other elements of the Department.

c. Assistant Secretary for Infrastructure Protection: Will oversee the following Infrastructure Protection functions:

- Carry out comprehensive assessments of the vulnerabilities of the key resources and critical infrastructure of the United States, including the performance of risk assessments to determine the risks posed by particular types of terrorist attacks within the United States (including an assessment of the probability of success of such attacks and the feasibility and potential efficacy of various countermeasures to such attacks).

- In coordination with the Assistant Secretary for Information Analysis, integrate relevant information, analyses, and vulnerability assessments (whether such information, analyses, or assessments are provided or produced by the Department or others) in order to identify priorities for protective and support measures by the Department, other agencies of the Federal Government, State and local government agencies and authorities, the private sector, and other entities.

- Develop a comprehensive national plan for securing the key resources and critical infrastructure of the United States, including power production, generation, and distribution systems, information technology and telecommunications systems (including satellites), electronic financial and property record storage and transmission systems, emergency preparedness communications systems, and the physical and technological assets that support such systems.

- Recommend measures necessary to protect the key resources and critical infrastructure of the United States in coordination with other agencies of the Federal Government and in cooperation with State and local government agencies and authorities, the private sector, and other entities.

- In coordination with the Under Secretary for Emergency Preparedness and Response, provide to State and local government entities, and upon request to private entities that own or operate critical information systems, crisis management support in response to threats to, or attacks on, critical information systems.

- Provide technical assistance, upon request, to the private sector and other government entities, in coordination with the Under Secretary for Emergency Preparedness and Response, with respect to emergency recovery plans to respond to major failures of critical information systems.

- Coordinate with other agencies of the Federal Government to provide specific warning information, and advice about appropriate protective measures and countermeasures, to State and local government agencies and authorities, the private sector, other entities, and the public.

**2. Science and Technology**

Under Secretary for Science and Technology: Will be responsible for performing the functions set forth in Section 302 of the Act, including the following:

- Advise the Secretary regarding research and development efforts and priorities in support of the Department's missions.

- Develop, in consultation with other appropriate executive agencies, a national policy and strategic plan for identifying priorities, goals, objectives, and policies for, and coordinating the Federal Government's civilian efforts with respect to, identifying and developing countermeasures to chemical, biological, radiological, nuclear, and other emerging terrorist threats, including the development of comprehensive, research-based definable goals for such efforts and of annual measurable objectives and specific targets to accomplish and evaluate the goals for such efforts.

- Support the Under Secretary for Information Analysis and Infrastructure Protection by assessing and testing homeland security vulnerabilities and possible threats.

- Conduct basic and applied research, development, demonstration, testing, and evaluation activities that are relevant to any or all elements of the Department, through both intramural and extramural programs, except that such responsibility does not extend to human health-related research and development activities.

- Establish priorities for directing, funding, and conducting national research, development, test and evaluation, and procurement of technology and systems for—

    1. preventing the importation of chemical, biological, radiological, nuclear, and related weapons and material; and
    2. detecting, preventing, protecting against, and responding to terrorist attacks.

- Establish a system for transferring homeland security developments or technologies to Federal, State, and local governments, and to private sector entities.

- Enter into work agreements, joint sponsorships, contracts, or any other agreements with the Department of Energy regarding the use of the national laboratories or sites and support of the science and technology base at those facilities.

- Collaborate with the Secretary of Agriculture and the Attorney General as provided in Section 212 of the Agricultural Bioterrorism Protection Act of 2002 (7 U.S.C. § 8401), as amended by Section 1709(b) of the Act.

- Collaborate with the Secretary of Health and Human Services and the Attorney General in determining any new biological agents and toxins that shall be listed as 'select agents' in Appendix A of part 72 of title 42, Code of Federal Regulations, pursuant to Section 351A of the Public Health Service Act (42 U.S.C. § 262a).

- Support United States leadership in science and technology.

- Establish and administer the primary research and development activities of the Department, including the long-term research and development needs and capabilities for all elements of the Department.

- Coordinate and integrate all research, development, demonstration, testing, and evaluation activities of the Department.

- Coordinate with other appropriate executive agencies in developing and carrying out the science and technology agenda of the Department to reduce duplication and identify unmet needs.

- Develop and oversee the administration of guidelines for merit review of research and development projects throughout the Department, and for the dissemination of research conducted or sponsored by the Department.

### 3. Border and Transportation Security

The Directorate of Border and Transportation Security ("BTS") will include the following: the Bureau of Border Security; the Office for Domestic Preparedness; the Customs Service; the Transportation Security Administration; FLETC; and FPS.

The BTS Directorate will also have in place the key leaders of the new Directorate to include:

a. Under Secretary for BTS: Will be responsible for oversight of all responsibilities set forth in Section 402 of the Act, including the following:

- Prevent the entry of terrorists and the instruments of terrorism into the United States.

- Secure the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department at ports of entry.

- Establish and administer rules, in accordance with Section 428 of the Act, governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.

- Establish national immigration enforcement policies and priorities.

- Administer the customs laws of the United States, except as otherwise provided in the Act.

- Conduct the inspection and related administrative functions of the USDA transferred to the Secretary of Homeland Security under Section 421 of the Act.

- In carrying out the foregoing responsibilities, ensure the speedy, orderly, and efficient flow of lawful traffic and commerce.

- Carry out the immigration enforcement functions specified under Section 441 of the Act that were vested by statute in, or performed by, the Commissioner of the INS (or any officer, employee, or component of the INS) immediately before the date on which the transfer of functions takes place.

b. Assistant Secretary for Border Security: Will report directly to the Under Secretary for Border and Transportation Security, and whose responsibilities will include the following:

- Establish and oversee the administration of the policies for performing such functions as are--
  1. transferred to the Under Secretary for Border and Transportation Security by Section 441 of the Act and delegated to the Assistant Secretary by the Under Secretary for Border and Transportation Security; or
  2. otherwise vested in the Assistant Secretary by law.

- Advise the Under Secretary for Border and Transportation Security with respect to any policy or operation of the Bureau of Border Security that may affect the Bureau of Citizenship and Immigration.

c. Director of the Office for Domestic Preparedness - Will report directly to the Under Secretary for Border and Transportation Security and will have the primary responsibility within the Executive Branch of the Federal Government for the preparedness of the United States for acts of terrorism, including the following responsibilities:

- Coordinate preparedness efforts at the Federal level, and work with all State, local, tribal, parish, and private sector emergency response providers on all matters pertaining to combating terrorism, including training, exercises, and equipment support.

- Coordinate or, as appropriate, consolidate communications and systems of communications relating to homeland security at all levels of government.

- Direct and supervise terrorism preparedness grant programs of the Federal Government (other than those programs administered by the Department of Health and Human Services) for all emergency response providers.

- Incorporate homeland security priorities into planning guidance on an agency level for the preparedness efforts of the Office for Domestic Preparedness.

- Provide agency-specific training for agents and analysts within the Department, other agencies, and State and local agencies, and international entities.

- As the lead executive branch agency for preparedness of the United States for acts of terrorism, cooperate closely with the FEMA, which shall have the primary responsibility within the

executive branch to prepare for and mitigate the effects of non-terrorist-related disasters in the United States.

- Assist and support the Secretary, in coordination with other Directorates and entities outside the Department, in conducting appropriate risk analysis and risk management activities of State, local, and tribal governments consistent with the mission and functions of the Directorate.

- Supervise those elements of the Office of National Preparedness of FEMA that relate to terrorism, which shall be consolidated within the Department in the ODP established pursuant to Section 430 of the Act.

**4. Emergency Preparedness and Response**

The Emergency Preparedness and Response Directorate will be headed by the Under Secretary for Emergency Preparedness and Response.

Under Secretary for EP&R: Will be responsible for all of those functions included within Section 502 of the Act, including:

- Helping to ensure the effectiveness of emergency response providers to terrorist attacks, major disasters, and other emergencies.

- With respect to the Nuclear Incident Response Team (regardless of whether it is operating as an organizational unit of the Department pursuant to the Act):

    1. Establishing standards and certifying when those standards have been met;

    2. Conducting joint and other exercises and training and evaluating performance; and,

    3. Providing funds to the Department of Energy and the Environmental Protection Agency, as appropriate, for homeland security planning, exercises and training, and equipment.

- Providing the Federal Government's response to terrorist attacks and major disasters, including:

    1. Managing such response;

2. Directing the Domestic Emergency Support Team, the Strategic National Stockpile, the National Disaster Medical System, and (when operating as an organizational unit of the Department pursuant to the Act) the Nuclear Incident Response Team;

3. Overseeing the Metropolitan Medical Response System; and

4. Coordinating other Federal response resources in the event of a terrorist attack or major disaster.

- Aiding the recovery from terrorist attacks and major disasters;

- Building a comprehensive national incident management system with Federal, State, and local government personnel, agencies, and authorities, to respond to such attacks and disasters.

- Consolidating existing Federal Government emergency response plans into a single, coordinated national response plan; and

- Developing comprehensive programs for developing interoperative communications technology, and helping to ensure that emergency response providers acquire such technology.

**5. Other Officers and Functions**

a. Director of the Bureau of Citizenship and Immigration Services: Will report directly to the Deputy Secretary; and will be responsible for the following:

- Establishing the policies for performing such functions as are transferred to the Director by Section 451 of the Act or otherwise vested in the Director by law.

- Oversight of the administration of such policies.

- Advising the Deputy Secretary with respect to any policy or operation of the Bureau of Citizenship and Immigration Services that may affect the Bureau of Border Security of the

Department, including potentially conflicting policies or operations.

- Establishing national immigration services policies and priorities.

- Meeting regularly with the Ombudsman described in Section 452 of the Act to correct serious service problems identified by the Ombudsman.

- Establishing procedures requiring a formal response to any recommendations submitted in the Ombudsman's annual report to Congress within three months after its submission to Congress.

b. Citizenship and Immigration Services Ombudsman: Will report directly to the Deputy Secretary; and will be responsible for the following:

- Assisting individuals and employers in resolving problems with the Bureau of Citizenship and Immigration Services;

- Identifying areas in which individuals and employers have problems in dealing with the Bureau of Citizenship and Immigration Services; and

- Proposing changes in the administrative practices of the Bureau of Citizenship and Immigration Services to mitigate identified problems.

**(3) Specification of the funds available to each agency that will be transferred to the Department as a result of transfers under the plan.**

- The attached tables provide estimates of the funds available to the agencies and entities that will be transferred to the Department by operation of the Act. The two tables include total funding (mandatory and discretionary including fees) and discretionary funding net of fees. The tables provide the enacted levels for 2002 and 2002 supplementals, and the President's requested levels for 2003.

  Because of the current state of the 2003 budget process, information concerning the funds that will be available to each transferring agency on the date of the proposed transfers is not currently available and will not likely be available during the time period in which the President is to submit this Reorganization Plan. As additional information becomes available, it will be provided as

may be required in accordance with the procedures under the Act for modification of this Plan or other applicable law.

**(4) Specification of the proposed allocations within the Department of unexpended funds transferred in connection with transfers under the plan.**

- The attached tables provide estimates of the unobligated balances as of September 30, 2002, for the agencies and programs that will be transferred to the Department. The first table provides estimates of unobligated balances for the accounts that are moving to the Department in whole. The second table provides estimates of the unobligated balances in the accounts of which only a portion will be transferring to the new Department. These latter estimates, however, are of the unobligated balances for the full account, only a portion of which are associated with the activities that will be transferred to the Department. In addition, these unobligated balances are based on the Department of Treasury's estimates as of September 30, 2002, which are the latest available figures. Since October 1, 2002, Departments and agencies (except the Department of Defense) have been operating under continuing resolutions, and, as such, have been spending these balances to maintain current operations.

Authority to reallocate unexpended funds of agencies transferred under this Plan is found in H.J. Res. 124, the continuing resolution in effect currently and until January 11, 2003. The resolution provides authority for the Office of Management and Budget to transfer an amount not to exceed $140,000,000 from unobligated balances of appropriations enacted before October 1, 2002 "for organizations and entities that will be transferred to the new Department and for salaries and expenses associated with the initiation of the Department." Such authority may be exercised upon providing 15 days' notice to the Appropriations Committees. We anticipate that it may be necessary to provide funding through such transfers both for transferring entities and for salaries and expenses associated with the initiation of the Department, including, for example, those associated with establishing the Office of the Secretary and other new offices provided for in the Act. Any plan to use such funding will follow the procedures required under the continuing resolution, including the provision of at least 15 days' notice to the Appropriations Committees.

**(5) Specification of any proposed disposition of property, facilities, contracts, records, and other assets and obligations of agencies transferred under the plan.**

- There is no intention to dispose of property, facility, contracts, records, and other assets and obligations of agencies transferred under the plan. All of such assets and obligations will transfer with each agency pursuant to Section 1511(d)(1) of the Act.

- Prior to and during the transition period (as defined by Section 1501(a)(2) of the Act), the Department may identify property, facilities, contracts, records, and other assets and obligations of agencies transferred that would be candidates for disposition due to duplication, non-use, obsolescence, and the like. If and when any such proposed dispositions are identified, we will follow provisions of the Act relating to modification of this plan or further notification of Congress.

**(6) Specification of the proposed allocations within the Department of the functions of the agencies and subdivisions that are not related directly to securing the homeland.**

- As agencies and subdivisions are transferred into the Department, any functions of those entities that are not directly related to securing the homeland will continue to be allocated to the agencies and subdivisions in which they are currently incorporated.

# Plaintiffs' Exhibit No. 3

# FEDERAL BUREAU OF INVESTIGATION

Precedence: ROUTINE Date: 11/08/2004

To: CJIS Attn: A/ADIC

New York Attn: ADIC
SAC
ASAC

Training Attn: ADIC
SAC

Washington Field Attn: ADIC
SAC

From: Security
Security Operations Section
Protective Security Unit/Room 1358
Contact:

Approved By:

Drafted By:

Case ID #: 261G-HQ-C1427882 (Pending)

Title: FBI POLICE WEAPONS OFF-DUTY CARRY POLICY;
PROTECTIVE SECURITY UNIT

Synopsis: To establish policy authorizing FBI Police personnel to carry Bureau-issued weapons off-duty.

Reference: 261G-HQ-C1427882 Serial 19

Policy: Deputy Director Gebhardt previously authorized the Unit Chief, Protective Security Unit (PrSU) to designate FBI Police Officers as emergency reaction personnel, and has granted them the authority to take home their Bureau-issued weapons and

supporting equipment to facilitate emergency response in the event of a major incident. This designation provides the FBI Police with an expeditious means of responding to serious or potentially threatening incidents that require an immediate, armed police presence to enhance the defensive posture at any FBI facility.

Furthermore, federal law, by virtue of the Law Enforcement Officers Safety Act of 2003, grants authority to all qualified active and retired law enforcement officers to carry a concealed firearm in an off-duty capacity in any State and the District of Columbia. This law includes the FBI Police by definition. Therefore the following policy will apply to all FBI Police personnel:

(1) All FBI Police Officers will be authorized to carry their FBI-issued firearm in an off-duty capacity anywhere in the United States subject to the laws of any State that a) permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or b) prohibit or restrict the possession of firearms on any State or local government property, installation, building, base, or park. In addition, before being granted authority to carry weapons off-duty, FBI Police personnel must have successfully completed required firearms training as well as legal training and training in home safety. FBI Police Officers must have successfully completed flying while armed training as a prerequisite to flying armed while on official duty.

(2) Only FBI-issued firearms will be carried by FBI Police Officers while on-duty. Only FBI-issued firearms may be transported in an official vehicle at any time.

(3) All FBI-issued firearms carried off-duty will be concealed and carried on the employee's person only in a Bureau approved holster.

(4) FBI Police Officers are not authorized to conduct any law enforcement activities in an off-duty capacity outside of their prescribed jurisdictional boundaries and have no more legal authority to defend themselves and/or take action in any situation than that of a private citizen as prescribed by state laws.

(5)(a) Pursuant to Chapter 49, Code of Federal Regulations (CFR), Section 1544.219 (a) (1) (iii), FBI Police Officers are authorized to fly armed when they are on "official travel which requires them to report to another location, armed and prepared for duty." FBI Police Officers traveling in this

status must also have completed the training program, "Law Enforcement Officers Flying Armed." 49 CFR 111.219 (a) (1) (iv).

(5) (b) Authorization to fly while armed requires the written approval of an FBI Police Major or above.

(5) (c) FBI Police Officers authorized to fly while armed must carry the firearm on their person aboard any commercial domestic flight. Firearms may not be carried in a purse, briefcase, backpack, or carry-on luggage. Under no circumstances should an FBI Police Officer surrender a firearm to airline personnel.

(5) (d) FBI Police Officers must complete the appropriate airline forms for traveling while armed, and comply with airline and airport procedures. FBI Police Officers are prohibited from consuming alcoholic beverages within eight hours of the beginning of a flight, during any flight on which the Officer is flying armed, or during time spent waiting for a connecting flight.

(5) (e) FBI Police Officers must avoid the unnecessary display of firearms while traveling by aircraft.

(6) All FBI-issued weapons will be handled and stored in accordance with the MIOG, Part 2, Section 12 (Firearms), and other applicable Bureau and federal regulations with respect to transportation, storage, and use.

**Procedures:** Firearms authorized for off-duty carry are limited to the FBI-issued handguns used and carried by FBI Police Officers when they are on duty. All other weapons will remain secured in an FBI Police armory and/or other specifically approved storage location(s).

While on the person of an FBI Police Officer, authorized firearms will only be carried in a FBI Police-issued or Bureau approved holster. The use of non-approved holsters is prohibited. FBI Police Officers will ensure proper storage of the weapon at all times (secured in accordance with MIOG guidelines) to prevent damage, inadvertent discharge, or theft of the weapon. Officers will carry their credentials on their person at all times while in possession of an FBI-issued weapon to facilitate verification of their bona fides if necessary.

FBI Police Officers should completely familiarize themselves with MIOG, Part 2, Section 12. When the Officer is off-duty, the FBI Police Officer should be in compliance with MIOG, Part 2, Section 12-6. If the FBI-issued weapon is not in

the Officer's immediate possession, the FBI-issued weapon must be stored in compliance with MIOG, Part 2, Section 12-6.1 and/or MIOG, Part 2, Section 12-6.2. MIOG, Part 2, Section 12-10.4 requires all non-Agent personnel who are authorized to carry firearms, including FBI Police Officers, to comply with all regulations in MIOG, Part 2, Section 12 that normally apply to FBI Special Agents.

The authorization to carry a FBI-issued weapon off-duty does not grant an FBI Police Officer the authority to enforce local, state, or federal laws outside the FBI buildings and grounds. When off-duty and outside FBI Police jurisdictional boundaries, FBI Police have no more legal authority to defend themselves and/or take action than that of a private citizen as prescribed by state laws.

All FBI Police Officers must handle firearms in a safe and responsible manner, utilizing strict adherence to the basic tenets of firearms safety.

All lost or stolen FBI-issued weapons must be reported immediately to an FBI Police Supervisor and the Deputy Unit Chief or Unit Chief of the PrSU.

Any shooting incidents, including those involving the intentional use of force by FBI Police personnel, the shooting of animals and accidental discharges must be reported immediately to an on-duty FBI Police supervisor. The FBI Police supervisor will immediately notify the Deputy Unit Chief or Unit Chief of the PrSU for any further action deemed necessary. This provision does not apply to the firing of FBI-issued weapons at a practice range whose use has been approved by the FBI Police Major or higher.

Any challenge to a FBI Police Officer's authority to carry or use a FBI-issued firearm must be immediately reported to an FBI Police Supervisor and the Deputy Unit Chief or Unit Chief of the PrSU for any further action deemed necessary.

An Officer involved in a traffic accident while traveling with or transporting a firearm will maintain custody and control of the weapon until the Officer is able to store the weapon consistent with this policy. If an Officer is injured and requires medical care or hospitalization, the Officer will, if possible, transfer control and custody of the weapon only to an FBI Special Agent or another FBI Police Officer summoned to the scene, or to another local, state, or federal law enforcement officer.

An Officer may be prohibited from carrying an FBI-issued weapon while off-duty by any FBI Police supervisor at any time, and any such prohibition shall be in effect immediately once the Officer is advised of the prohibition. The supervisor will ensure that the Deputy Unit Chief or Unit Chief of the PrSU is promptly notified whenever an Officer is prohibited from carrying a FBI-issued weapon.

This policy will not preclude an FBI Police Officer from transporting other privately owned legal firearms for recreational purposes while in an off-duty capacity in accordance with all local, state and federal laws.

# Plaintiffs' Exhibit No. 4

**Affidavit of Yiu Tak Tao**

1. I am a Federal Bureau of Investigation ("FBI") Police Officer. I work in New York City.

2. As far as I can remember since entering on duty with the FBI Police on March 16, 1997, it was necessary for me to receive and maintain special U.S. Marshall Deputation authority. As described in the FBI Police Handbook (June 2000 ed., pp. 8-9), "The FBI complex at Quantico is not under the 'charge and control of the Administrator, General Services Administrations.' Therefore, the authority to appoint Special Police Officers is not available for use there. In addition, it is my understanding that because of local circumstances, the FBI needed greater security over the spaces it occupied in New York City than could be provided by the Federal Protective Service. Therefore, in both of those locations, the U.S. Marshals' Service deputized some employees as Special Deputy U.S. Marshals.

3. Prior to the expiration of my authority in 2006, I and the entire unit at the New York Office filed for renewals of our U.S. Marshals Deputation authority. My request was denied on the grounds that there is existing statutory authority in Title 28 USC, Section 540C for FBI Police Officers to perform the functions outlined in the application for the authority.

4. Since the expiration of my authority in 2006, I have not received U.S. Marshals Deputation authority or any local law enforcement authority of any kind, but have continued to perform all my job functions.

I, Yiu Tak Tao, have read this statement consisting of 1 page. I hereby declare under a penalty of perjury that the forgoing statement is true, correct, and complete to the best of my knowledge and belief.

The signature of Affiant: Yiu Tak Tao

Date: 1-30-2008

Subscribed and sworn to before me this 30 day of Jan 2008:

______________________________

The signature of Notary Public

EMILY C. LIU
Notary Public, State of New York
No. 01LI5051174
Qualified in Queens County
Certificate Filed in New York County
Commission Expires October 30, 2009

# Plaintiffs' Exhibit No. 5

U.S. Department of Justice

United States Marshals Service

*Investigative Services Division*

*Washington, DC 20530-1000*

January 18, 2007

j2, b7c, b6
usms

Mr. [redacted]
Chief, Operational Support Section
Federal Bureau of Investigation
Washington, D.C. 20535-0001

Dear Mr. [redacted] usms

Your request to renew and initiate new special deputation authority for FBI Police Officers in New York and Quantico, Virginia has been reviewed and denied. The basis for this denial is that there is existing statutory authority in Title 28 USC, Section 540C for FBI Police Officers to perform the functions outlined in your letter. This particular statute negates the need to convey additional authority to these individuals, therefore, deputizing them is not necessary.

If you believe there is additional information that the U.S. Marshals Service hasn't considered that would otherwise change the outcome of this decision, please provide it to Mrs. [redacted] of the Special Deputations Unit.

j2, b7c, b6
usms

Sincerely,

[redacted]

Acting Chief
Special Deputations Unit

BEST COPY AVAILABLE

# Plaintiffs' Exhibit No. 6

**Affidavit of Gregg A. Oliverio**

3. I am a Federal Bureau of Investigation ("FBI") Lead Police Officer. I am I work in Clarksburg, WV.

4. On Jan. 22-25, 2007 myself and three (3) other officers were deployed to Dallas, TX to guard one of our Mobil Command Posts. The truck and trailer was parked in the fenced in parking lot of the local field office. The office was secured by using contract guards at the gate and in the building. We worked in the trailer securing it while it was in the operational mode.

5. I was not deputized for this assignment. To my knowledge, none of the three (3) officers were deputized by the US Marshall Service or local police.

6. On June 21, 2007 myself and five (5) others were deployed to Winchester, VA for a Family Day event for Bureau employees. The event took place at our office building in which the Bureau leases. Our job was to control entry into the parking lot, stay mobile in the crowd to insure all were authorized to be there and to maintain order.

7. I was not deputized for this assignment. To my knowledge, none of the five (5) officers were deputized by the US Marshall Service or local police.

I, Gregg A. Oliverio, have read this statement consisting of 1 page. I hereby declare under a penalty of perjury that the forgoing statement is true, correct, and complete to the best of my knowledge and belief.

The signature of Affiant: [signature]

Date: 1/28/08

Subscribed and sworn to before me this 28 day of January 2008:

Maryanna Talkington

The signature of Notary Public

OFFICIAL SEAL
Notary Public, State Of West Virginia
MARYANNA TALKINGTON
Rt. 1 Box 1045
Greenwood, WV 26415
My Commission Expires May 15, 2013

# Plaintiffs' Exhibit No. 7

**Affidavit of Shawn Strushensky**

1. I am a Federal Bureau of Investigation ("FBI") Police Officer. I work in Clarksburg, WV.

2. On December 30, 2007 to January 3, 2008, the FBI sent eight (8) Police Officer to Phoenix, AZ to work security for an FBI command center in the area. I was one of the eight (8) officers.

3. I was not deputized for this detail. To my knowledge, none of the eight (8) officers were deputized by the US Marshall Service or local police.

I, Shawn Strushensky, have read this statement consisting of 1 page. I hereby declare under a penalty of perjury that the forgoing statement is true, correct, and complete to the best of my knowledge and belief.

The signature of Affiant: ____________________

Date: 1-25-08

Subscribed and sworn to before me this 25 day of Jan. 2008:

____________________

The signature of Notary Public

OFFICIAL SEAL
NOTARY PUBLIC, STATE OF WEST VIRGINIA
SUSAN F. BALDERSON
121 STEELE STREET
BRIDGEPORT, WV 26330
My commission expires April 19, 2012

# Plaintiffs' Exhibit No. 8

**Affidavit of Scott Giles**

1. I am a Federal Bureau of Investigation ("FBI") Police Officer. I work in Quantico, VA.

2. I recently served as deployment supervisor for the TOPOFF 4 exercise in Portland, OR from October 12, 2007 to October 20, 2007. Just prior to this deployment, on or around September 28, 2007, we had mandatory legal training with Attorney Choi from the FBI. At this training, I asked if deputations were necessary for me and the officers going on this deployment, and he replied that they were not as we were covered under 540c.

3. The training session was videotaped. My Lt. asked me to start and end the video. It is my understanding that the videotape still exists and is at Quantico.

4. During my time in Portland, OR, I was not deputized by the U.S. Marshals Service or by any local agency.

I, Scott Giles, have read this statement consisting of 1 page. I hereby declare under a penalty of perjury that the forgoing statement is true, correct, and complete to the best of my knowledge and belief.

The signature of Affiant: ______________

Date: 1-28-08

Subscribed and sworn to before me this 28th day of January 2008:

______________
The signature of Notary Public Comm. expires 08-31-2010

County of Louisa
State of Virginia

HEATHER L. SUTHERLAND
MY COMMISSION EXPIRES
COMMONWEALTH OF VIRGINIA
COMMISSION # 312935
08-31-2010
NOTARY PUBLIC

# Plaintiffs' Exhibit No. 9

**Affidavit of John J Hays**

1. I am a Federal Bureau of Investigation ("FBI") Police Officer. I work in Clarksburg, WV.

2. I was detailed to Portland, OR to assist in the security of the TOPOFF 4 Counter Terrorism from October 12, 2007 to October 20, 2007. I flew armed from Pittsburgh to Chicago then to Portland and upon arrival was armed daily.

3. Once in Portland, myself and the other officers were informed that we had our "normal jurisdiction." We also had jurisdiction to make arrest in the event of a riot situation where the building we were using came under assault.

4. We were working out of TSA office space, in what appeared to be a non-federal building.

5. During my time in Portland, OR, I was not deputized by the U.S. Marshals Service or by any local agency.

I, John J Hays, have read this statement consisting of 1 page. I hereby declare under a penalty of perjury that the forgoing statement is true, correct, and complete to the best of my knowledge and belief.

The signature of Affiant: John J Hays

Date: 1/28/08

Subscribed and sworn to before me this 28 day of January 2008:

Rebecca L Miller

The signature of Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
REBECCA L. MILLER
WesBanco Bank, Inc.
2820 White Hall Blvd.
White Hall, West Virginia 26554
My Commission Expires Oct. 5, 2016